**Jane Borda FEICK, Joseph L. Borda, Jr., Anthony Borda, Charles Borda, Jr., and Ann Borda Marin, Plaintiffs-Appellants,**

v.

**Charles J. FLEENER and Sally Fleener Cave, Defendants-Appellees.**

**No. 972, Docket 80–9128.**

United States Court of Appeals, Second Circuit.

Argued March 30, 1981.

Decided June 22, 1981.

Nicholas J. Zoogman, Anderson, Russell, Kill & Olick, P.C., New York City, for plaintiffs-appellants.

Peter R. Sherman, Washington, D.C., (Michael F. Curtin and David Barmak, Washington, D.C., of counsel), Sherman, Fox, Meehan & Curtin, P.C., Washington, D.C., for defendants-appellees.

Before WATERMAN, and MANSFIELD, Circuit Judges, and NEWMAN, Judge.*

NEWMAN, Judge:

We are faced with a family dispute wherein appellants seek recovery from appellees of some fifty thousand dollars representing a portion of the legal fees paid by appellants for services rendered in connection with a decedent's estate which allegedly benefited appellees.[1] Appellants, who are brothers and sisters, also are cousins of appellees; appellees are brother and sister.

This is an appeal from an order of the District Court, per Judge Whitman Knapp, dated July 31, 1979, dismissing the first cause of action in the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure; and from his order dated November 18, 1980 granting summary judgment, and dismissing the second and third causes of action in the complaint under Rule 56, F.R. Civ.P.[2] We affirm.

### I.

The material facts, although a maze of complexities, are not in dispute.

Leopold Borda ("Leopold") died testate on January 15, 1976. His will bequeathed the "net proceeds" of certain property located in Puerto Rico, known as "Esperanza", to two nephews, Joseph L. Borda, Sr. ("Joseph, Sr.") and Charles Borda, Sr. ("Charles, Sr."), and to his niece Marguerite Borda Fleener ("Marguerite"), or their issue. Joseph, Sr. predeceased Leopold leaving five surviving children, appellants herein: Joseph Borda, Jr. ("Joseph, Jr."), Anthony Borda, Charles A. Borda, Jane Borda Feick and Ann Borda Marin. Leopold's niece, Marguerite, likewise predeceased Leopold, survived by two children, the appellees: Charles J. Fleener ("Fleener") and Sally Fleener Cave. Charles, Sr. survived Leopold, and is still alive, but is not a party to this action.

Although Leopold's will named his nephews and niece as legatees, Susan Rogers ("Rogers") claimed to be Leopold's spouse, and Guillermina Martinez ("Guillermina") purported to be Leopold's daughter. Rogers and Guillermina both asserted claims against Leopold's estate as superior to the interests of the designated beneficiaries.

It further appears that on January 27, 1969 Leopold was adjudicated an incompetent, and Joseph, Sr. and Rogers were ap-

---

* Honorable Bernard Newman, Judge of the United States Court of International Trade, sitting by designation.

1. Initially, appellants commenced this action in the Supreme Court of New York, New York County on November 10, 1978; on January 2, 1979 the action was removed to the United States District Court for the Southern District of New York by appellees.

2. The order of November 18, 1980 was amended by a memorandum and order dated December 1, 1980 which merely corrected two typographical errors.

pointed co-committees' of his person and estate.' Thereafter, Charles, Sr. commenced an action in the New York Supreme Court, Westchester County to annul Leopold's marriage to Rogers on the basis of Leopold's incompetence at the time of the marriage ceremony. The marriage was annulled by the State Supreme Court on July 11, 1972 (affirmed on appeal), thus eliminating Rogers' claim to any portion of Leopold's estate. Further, a settlement was negotiated with the alleged daughter, Guillermina, thus disposing of her claim against Leopold's estate.

In January 1971, Joseph, Sr. and Charles, Sr. executed and delivered to the law firm of Jaffe Cohen, Crystal & Mintz ("Jaffe Cohen") a document dated January 29, 1971 wherein Joseph, Sr. and Charles, Sr. agreed:

to retain the services of [Jaffe Cohen] in representing us in an Annulment-Divorce proceeding of Leopold Borda against Susan Borda, and all matters related thereto.

We agree jointly and severally to pay you the following:

\* \* \* \* \* \*

3. Twenty-Five (25%) percent of all monies inherited by us and/or any other nieces, nephews or descendents of nieces or nephews of Leopold Borda from the Estate of Leopold Borda will be paid immediately to you upon payment by the Estate.

In addition to bearing the signatures of Joseph, Sr. and Charles, Sr. binding them "individually, jointly and severally", the January retainer agreement was signed by Joseph, Sr. as "Attorney-in-fact" for appellees. At the time of executing the retainer agreement with Jaffe Cohen, Joseph Sr. possessed separate written powers of attorney dated June 5, 1970 from each of the appellees appointing Joseph, Sr. as their attorney—

to act with regard to my *one-eighteenth (¹⁄₁₈)* undivided interest in the plantation in Manati, Puerto Rico, known as "Esperanza", including, without limitation, all real property interests therein, all buildings and other improvements erected

thereon and all appurtenances thereto. [Emphasis added.]

Joseph, Sr. died in May 1971 (terminat᠆ his commission), and shortly thereaᡶ᠆ Rogers was removed as a committee of Leopold's person and estate. Thereupon, Frank Connelly, Esq. was appointed by the Supreme Court as sole committee and guardian *ad litem* to represent Leopold in the annulment proceeding. Connelly then intervened in the annulment action.

Subsequently on September 28, 1971, Charles Sr. and each of the appellants signed and delivered to Jaffe Cohen a letter reaffirming the January 29, 1971 retainer agreement. The September letter specifically stated that Fleener had disclaimed authorization for any representation of his interest by Jaffe Cohen:

On May 19, 1971 our agreement with you was confirmed by Charles Borda and by Joseph L. Borda, Jr. following the death of Joseph L. Borda, Sr. on May 5, 1971. Joseph L. Borda, Jr. was acting on behalf of all of the heirs of Joseph L. Borda, Sr. and Charles Borda was acting both in his individual capacity · and as Executor of the Estate of his brother, Joseph L. Borda. At that time, we sought to obtain confirmation from Charles Joseph Fleener of his commitment to proceed with the various steps which your law firm had contemplated would be forthcoming. In the interim you have met with Mr. Fleener and with his attorney Michael Curtin, and as a result of your meeting, he has promised that he would advise us as to his position with regard to further litigation. Mr. Fleener has now taken the position that he does not want verbal [sic] litigation brought on his behalf. *Regardless of the position taken by Charles Joseph Fleener, we wish to reconfirm our commitments as set forth in the letter of January 29, 1971 and as confirmed on May 19, 1971.* [Emphasis added.]

The September letter went on to state:

We understand that your activities thus far have resulted in your law firm

having already earned 25% of whatever inheritance we may receive from the Estate of Leopold Borda. Thus, in the event that at any point we should direct you not to continue with respect to any activities which you are performing on our behalf, nonetheless you will have earned the 25% deferred compensation by the activities which you have performed to date.

Significantly, the September letter was not signed by either of the appellees.

As mentioned, Leopold's marriage to Rogers was annulled by the Supreme Court of New York in July 1972. The State Supreme Court awarded both Jaffe Cohen and Connelly substantial fees for their services in connection with the annulment litigation.

About a month after the annulment of Leopold's marriage, Fleener conferred with several of the appellants regarding various family matters. Either at or shortly after this meeting, Fleener provided Joseph, Jr. with a letter dated August 11, 1972, which reviewed various issues that were the subject of the family's meeting. The letter offered "to present to [Joseph, Jr.], for the family's consideration, the topics of discussion and possible solutions to these topics that have been the subject of our meetings and conversations for the past several months." Charles Fleener went on to outline and discuss various "problems". One such problem was the annulment litigation in New York, concerning which Fleener's letter stated:

The litigation in New York involving Susan Rogers [sic] and Uncle Leopoldo unfortunately, is and has been a bone of contention since the death of your father [Joseph, Sr.]. Neither Sally nor I were aware of the activity going on after mother's death. It was not until after your father's death that we came to understand the commitments made in undertaking the lawsuit.

Without questioning or challenging the motives of either Uncle Charles [Charles, Sr.] or your father [Joseph, Sr.], we chose not to participate in the suit. Last fall you and your brothers and sisters chose a different path and committed yourselves to be obligated to Mr. Berman's law firm [Jaffe Cohen] for the prosecution of the suit. We feel we have no obligation to Mr. Berman's firm or any other lawyer or lawyers involved in this litigation. We made a conscious decision not to become financially obligated for any fees, costs or other expenses incurred in its prosecution. Mr. Berman, as all of you, has been well aware of this decision since last year.

Continuing, the letter stated:

Nonetheless, Sally and I do not want this decision to create an undeserved windfall for us. If, as the result of your efforts in pushing this litigation, we inherit from Uncle Leo's estate any money or other property which, but for the lawsuit, we would not have inherited we will contribute up to one-third of that portion of our inheritance to you, your sisters and brothers, and Uncle Charlie to help defray the legal fees, expenses and costs incurred in your pursuing the litigation.

You must understand that Sally and I made certain judgments about this litigation last year. As a result, we chose not to become obligated to anyone for its prosecution. Part of our judgment was based on the fact that we were advised by our lawyer that there was little likelihood that there would be any substantial inheritance coming from Uncle Leo's estate, whether the lawsuit was successful or not. If, in fact, this proves not to be the case we are willing to help defray the expenses that have been incurred. On the other hand, if our judgment was correct and we only receive from Uncle Leo's estate that which we would have gotten whether or not the suit was filed, we do not think it appropriate for us to contribute to the expenses.

Fleener's August 11, 1972 letter also discussed other matters of dispute among the family members. One such issue was the pending claim of Guillermina as the illegitimate daughter of Leopold. Fleener set forth appellees' position regarding Guillermina's claim in the August 11, 1972 letter:

Last fall Mr. Berman asked our lawyer's permission to negotiate with Guillermina's lawyers on Sally's and my behalf. He also asked for us to contribute to the expenses of the trip to undertake these negotiations. We chose not to acquiesce in either request. Nonetheless, we did indicate that if, in fact, an agreement was reached with Guillermina we would review same, and, if possible, go along with its terms.

Fleener then stated that "if * * * your efforts create a benefit for Sally and me we would, of course, agree to the same terms in connection with that benefit as we have in connection with the Leopoldo lawsuit mentioned above."

Fleener concluded his letter:

As you can readily appreciate, all of the foregoing is in the spirit of our discussions, i. e., an effort to accommodate various legal positions in an attempt to settle once and for all the family dealings covering these matters.

You can also appreciate the fact that if these matters are to be settled, as outlined above, all those affected thereby must agree to the proposals. Accordingly, I would ask that you circulate this letter to Anthony, Ann, Janie, and Charles. Events are moving *very* rapidly and it will be to the family's advantage if we can formalize our understanding as soon as possible. Considering my immediate schedule, and that of Mike Curtin's, I would request that we have some response from you by Tuesday, September 5.

Appellants never responded to Fleener's letter.

Guillermina's claims were settled in February 1978. For the firm's services relative to the settlement of Guillermina's claim, Jaffe Cohen was awarded a fee of $37,500 from Leopold's estate by the State Supreme Court. Jaffe Cohen never charged appellants, and appellants never paid, any fee for services rendered in connection with Guillermina's claim.

In due course, Leopold's will was admitted to probate on April 6, 1976. Total dis-tributions from Leopold's estate to appellants, appellees and Charles, Sr. have exceeded one million dollars, representing principal and interest on the proceeds received from Puerto Rico's expropriation of Leopold's one-third interest in Esperanza. Conforming to their retainer agreement with Jaffe Cohen, appellants and Charles, Sr. ultimately paid 25 percent of the distribution plus disbursements to Jaffe Cohen.

When Jaffe Cohen made an initial distribution of funds to appellants and Charles, Sr. in April 1978, Ernest Allen Cohen, a Jaffe Cohen partner, explained the computation of Jaffe Cohen's fee and reiterated the fee arrangement:

As was specified in the retainer agreements executed after the death of your father, Joseph, the Fleeners had taken the position that your father was not their attorney-in-fact and therefore was not authorized to execute a retainer on their behalf as he had done prior to his death. Thus, we had advised you, and you had acknowledged by executing the subsequent retainer agreement, that we would only proceed on the basis of each of the signatories taking full responsibility for the full amount of our fee so that we would not be cast in the position of having to dispute it with any of the members of your family, the Fleeners or otherwise. This arrangement has been confirmed many times since the retainer was originally executed.

## II.

The first cause of action in appellants' complaint seeks payment of a proportionate share of Jaffe Cohen's legal fees and expenses on the ground that appellees breached an agreement retaining Jaffe Cohen made by Joseph, Sr., pursuant to powers of attorney allegedly authorizing him to act on their behalf. This was dismissed under Rule 12(b)(6), F.R.Civ.P. for failure to state a claim upon which relief could be granted.

Appellants' second cause of action seeks recovery of a proportionate share of Jaffe Cohen's legal fees on the ground that appel-

lees were unjustly enriched by reason of the alleged creation of a "common fund" through the legal services.[3] The third cause of action alleged that Fleener's August 11, 1972 letter to Joseph Jr. was a binding agreement or promise to pay a share of the fees, upon which appellants relied to their detriment. These two claims were dismissed by Judge Knapp, pursuant to appellees' motion for summary judgment, on the ground that upon the undisputed facts appellants were not entitled to any recovery.

### III.

Turning to the merits, we initially consider appellants' contention that the District Court erred in dismissing their first cause of action under Rule 12(b)(6), F.R. Civ.P. The District Court based its decision on the ground that appellees' powers of attorney[4] did not authorize Joseph, Sr. to retain Jaffe Cohen in an effort to have Leopold's marriage annulled, since Joseph, Sr.'s authority was restricted to appellees' separate one-eighteenth interests in Esperanza, and "[t]hose interests would be completely unaffected by any change in the disposition of Leopold's estate". We find no error in that ruling.

As the District Court aptly pointed out, Joseph, Sr.'s powers were expressly limited by the June 5, 1970 instruments executed by appellees to their one-eighteenth undivided interests in Esperanza. To appreciate the significance of this express limitation on the power granted to Joseph, Sr., several facts should be noted. Joseph, Sr., Charles, Sr. and appellees' mother (Marguerite) jointly owned a one-third undivided interest in Esperanza. When appellees' mother died, her one-ninth

interest devolved to appellees in equal one-eighteenth undivided shares. In addition, Leopold owned a separate one-third undivided interest in Esperanza, and his will devised such interest (or the proceeds in the event of sale) to Charles, Sr., Joseph, Sr., and Marguerite, or to their issue. Consequently, appellees as the surviving issue of Marguerite, had two interests in Esperanza: first, each owned an undivided one-eighteenth share; and second, as potential legatees under Leopold's will, each had an additional expectancy. The plain language of the powers of attorney granted to Joseph, Sr. affected only the undivided one-eighteenth interest in Esperanza which appellees then actually owned. There is not the slightest suggestion in those meticulously phrased instruments that the attorney-in-fact (Joseph, Sr.) was authorized to take any action on behalf of appellees relating to their potential additional interests or expectancies as beneficiaries of Leopold's estate. While ambiguities are to be construed against the grantor of a power, *Silver Bay Ass'n for Christian Conferences and Training v. Landon*, 121 Misc. 712, 201 N.Y.S. 868, (Sup.Ct.1923), aff'd, 215 A.D. 850, 213 N.Y.S. 910 (3d Dept. 1926), the District Court found that the powers of attorney cannot in these circumstances be construed to authorize Joseph, Sr.'s action. We agree.

Since the documents upon which appellants based their claim show on their face absence of any grounds for relief, dismissal was proper. *Jacksonville Newspaper Printing Pressman and Assistants Union No. 57 v. Florida Publishing Company*, 340 F.Supp. 993 (M.D.Fla), aff'd, 468 F.2d 824 (5th Cir.), cert. denied, 411 U.S. 906, 93 S.Ct. 1531, 36 L.Ed.2d 196 (1972). Accordingly, Judge Knapp's dismissal of appellants' first cause of action was correct insofar as it was predicated upon the powers of attorney.

3. Appellants argue that Jaffe Cohen's efforts eliminated the claims of both Rogers and Guillermina to Leopold's estate, thus creating a fund in which the specific beneficiaries named in the will, including appellees, shared. Additionally, appellants contend that a fund was created by virtue of the fact that Jaffe Cohen succeeded in reconstructing the net proceeds of "Esperanza" and having the capital gains taxes and litigation expenses paid from the general

estate rather than from the proceeds of the condemnation proceeding, thereby increasing the amount available for distribution to the beneficiaries, including appellees.

4. These powers of attorney were attached as exhibits to the complaint and were incorporated therein, becoming part of the complaint for all purposes. Rule 10(c) of the Federal Rules of Civil Procedure.

■ Appellants contend, however, that in dismissing the first cause of action the District Court erroneously disregarded the allegations concerning Joseph, Sr.'s role as appellants' and appellees' "attorney-in-fact"; concerning Fleener's letter of August 11, 1972 which promised to pay appellees' share of Jaffe Cohen's fees; and concerning appellees' ratification of Joseph, Sr.'s actions on their behalf by retention of substantial benefits received because of Jaffe Cohen's efforts. Further, appellants insist that the District Court committed error by unduly restricting the powers of attorney. In this aspect, appellants maintain that they are entitled to prove at trial that the powers of attorney were intended by appellees to authorize Joseph, Sr.'s "efforts to conserve and increase the eventual funds available for distribution to defendants from the sale or other disposition of 'Esperanza'. (Appellant's brief, 22–23.)

Appellants' argument that they were entitled to show at a trial that Joseph, Sr. was appellees' attorney-in-fact by virtue of his "course of conduct and consistent role over a period of many years" is completely without merit. The powers executed by appellees on June 5, 1970 expressly delineating Joseph, Sr.'s authority respecting Esperanza negate any theory of an implied general appointment encompassing some unspecified broader authority. Moreover, there is no indication in the complaint that appellants used the term "attorney-in-fact" in anything other than its ordinary sense, which connotes that the authority be "conferred by an instrument in writing, called a 'letter of attorney', or more commonly a 'power of attorney'." *Black's Law Dictionary* (Fourth ed., 1968), p. 164. Appellants' ratification argument is untenable in light of appellees' repeated disclaimers of any responsibility for Joseph, Sr.'s actions.

Finally, appellants urge that the District Court should not have dismissed their first cause of action in view of their allegation that Fleener agreed in his August 11, 1972 letter that appellees would pay their share of Jaffe Cohen's fees. While it is true that such allegation is encompassed by appellants' first cause of action, the complaint pleads three distinct causes of action: the first, based on the January retainer letter signed by Joseph, Sr. as appellees' attorney-in-fact (which was dismissed by Judge Knapp); the second, premised on an unjust enrichment theory; and the third, based on Fleener's August 11, 1972 letter (which latter two causes were not dismissed). Despite the indication by the District Court that appellants' "first cause of action" was dismissed, plainly the Court actually dismissed only that part of appellants' case which related to the January retainer letter and the powers of attorney, while expressly finding that "plaintiffs' third cause of action [viz., that based on Fleener's letter of August 11, 1972] survives the motion to dismiss" (District Court's July 31, 1979 Memorandum and Order, p. 5).

Any confusion engendered by the District Court's dismissal of appellants' first cause of action pursuant to Rule 12(b)(6) notwithstanding the express survival of their cause of action based on Fleener's letter of August 11, 1972, may be ascribed to the overlapping and confusing manner in which the causes of action were pleaded in the complaint. All of the substantive allegations are lumped under the heading "First Cause of Action", and then are adopted by reference and applied to different theories under the headings "Second Cause of Action" and "Third Cause of Action". Hence, appellants claim that the allegation regarding the August 11, 1972 letter (paragraph 8) was part of the First Cause of Action which was dismissed by the District Court. Nevertheless, it is obvious from the Court's discussion of appellants' claims that the "First Cause of Action" was treated as involving solely the January 1971 retainer agreement and the powers of attorney. In view of the foregoing considerations and all the facts and circumstances, we cannot perceive any benefit to appellants if they were permitted to file an amended complaint, as they have now requested in a footnote to

their brief.[5] Accordingly, the request is denied.

## IV.

We now consider the District Court's grant of summary judgment dismissing appellants' second and third causes of action.

Appellants insist that summary judgment was inappropriate in this case because of the existence of genuine issues of material fact. It is, of course, fundamental that on a motion for summary judgment the court cannot try issues of fact; it determines whether there are justiciable issues for trial. *S.E.C. v. Research Automation Corporation*, 585 F.2d 31 (2d Cir. 1978). Specifically, appellants advance the argument that summary judgment was inappropriate in the instant case respecting appellants' second and third causes of action because they involve issues of motive and intent which preclude summary judgment. See *e. g. Cali v. Eastern Airlines, Inc.*, 442 F.2d 65 (2d Cir. 1971).

We are unable to agree with appellants' position that there exist genuine issues of material fact in this case. On the contrary, this case represents a classic example of the effective use of the summary judgment procedure. This Circuit has observed that "just as trial by affidavit represents an unjustified diminution of the rights of plaintiffs, neither courts nor defendants should be subjected to trials which can be little more than harassment." *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 96 (2d Cir. 1970). Here, the applicable law applied to the undisputed facts shows that appellees were entitled to summary judgment dismissing the second and third causes of action, thus obviating the necessity of a trial. Courts, refusing to exalt form over substance, cannot be awed by procedural spectres, and cannot be swayed by feigned issues.

The District Court, after carefully considering the applicable New York law, rejected appellants' argument that appellees were unjustly enriched as a result of the services performed by Jaffe Cohen, and therefore by virtue of the "common fund" doctrine, appellants were entitled to a proportionate reimbursement for their payments to that firm.

■ We are drawn to the conclusion that the District Court correctly held appellees should not be required to contribute to Jaffe Cohen's fees on the basis of the "common fund" doctrine. The general rule in New York is that parties are not obligated to pay the fees of attorneys whom they have not retained, and a party who contracts for a lawyer's services cannot compel contribution for benefits obtained by others as a result of those services. *E.g., In Re Loomis*, 273 N.Y. 76, 6 N.E.2d 103 (1937); *Lynn v. Agnew*, 179 App.Div. 305, 166 N.Y.S. 274 (1917), *aff'd sub nom. Lynn v. McCann*, 226 N.Y. 654, 123 N.E. 877 (1919). Under this general rule appellants are not entitled to contribution from appellees. Here, appellants retained Jaffe Cohen to provide legal services, and appellees declined to join in appellants' efforts. Consequently, even if Jaffe Cohen's services benefited appellees, liability for the fees cannot be imposed upon them in the absence of their agreement.

Appellants, however, heavily rely upon the "common fund" doctrine which provides an exception to the *Loomis* rule. Under that doctrine, individuals who benefit from the creation or distribution of a fund may be charged with the fees of the attorney whose efforts created the fund, although they had no contract with that attorney. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 167 (1939); *Realty Equities Corp. of New York v. Gerosa*, 30 Misc.2d 481, 209 N.Y.S.2d 446 (Sup.Ct.1960).

■ In this case, the undisputed facts show that no "fund" was created by Jaffe Cohen's efforts. The money that was dis-

---

**5.** Parenthetically, appellants made no application to the District Court to file an amended complaint.

tributed to appellants and appellees, which might otherwise have been distributed to Rogers and Guillermina, stems from one source: the estate of Leopold. Obviously, Jaffe Cohen played no role in creating Leopold's estate. Similarly, inasmuch as appellants and appellees were named as beneficiaries in Leopold's will, Jaffe Cohen's services played no role in creating their status as beneficiaries under the will. While Jaffe Cohen's efforts helped eliminate the competing claims of Rogers and Guillermina, such efforts did not create a fund.

Although no New York case precisely in point has been cited by the parties or found by the Court, the present case appears somewhat analogous to *Baron v. Baron*, 286 So.2d 480 (La.App.1974), cited in appellees' brief.[6] *Baron* grew out of an earlier suit by the plaintiff to declare approximately $22,-000 of gold certificates an asset in the estate of plaintiff's aunt. The suit was successful, resulting in the receipt by plaintiff and his brother of an additional $5,500 each from the aunt's estate, while their cousin received an additional $11,000. Plaintiff, an attorney, then sued his cousin to recover the fair value of plaintiff's services rendered in successfully pursuing the earlier suit. The trial court awarded plaintiff legal fees of $2,500, but the Court of Appeals of Louisiana reversed, holding *inter alia*:

> [t]he present case would not fall under the 'fund' doctrine because the plaintiff did not create a fund; he merely secured judicial recognition of the ownership by the succession of an asset already owned by it.

Here too, no fund was created by appellants' or Jaffe Cohen's efforts since the assets distributed were already part of Leopold's estate. Nor were the assets of the estate enhanced by Jaffe Cohen's efforts in the annulment proceeding, that merely eliminated a competing claim. Hence, even if the annulment had not been granted, but

Rogers had predeceased Leopold, appellants and appellees would have received the same distributions which they have received with the granting of the annulment.

*Sprague v. Ticonic*, relied upon by appellants, is readily distinguishable. There, Sprague's money had been deposited in a bank's commercial checking account and, complying with statute, bonds were set aside by the bank as collateral to secure the funds deposited. When the bank failed, Sprague sued to impose a trust on the proceeds of the bonds. After succeeding in impressing a trust for the amount due, Sprague applied for an order directing that her counsel's fees be paid out of the proceeds of the bonds. The Supreme Court held that federal courts had the power to grant such a request, and that Sprague by establishing her claim, necessarily established the claims of others to the same bonds. But importantly, in *Sprague*, after the funds deposited in the commercial checking account were lost, Sprague's efforts established a new, distinct and separate fund for the benefit of others, viz., the bonds held as collateral. In our situation, however, the right of appellees (and appellants) to succeed to Leopold's estate was established by their designation as legatees in his will, which status was subject to the competing rights of Rogers and Guillermina. The issue, however, was never the creation of a fund, but rather concerned the parties to whom Leopold's estate would be distributed.

## V.

Lastly, we reach the problem of appellants' attempt to hold appellees liable for contribution to Jaffe Cohen's fees based upon Fleener's letter of August 11, 1972.[7]

▮ After a careful consideration of that letter, we determine that the District Court correctly ruled that such letter "is in no sense a contract" supported by considera-

---

6. Notwithstanding appellees' assertion in their brief (p.31) that *Baron* "is precisely on point", appellants made no attempt to distinguish that case in their reply brief.

7. In this letter, Fleener expressed appellees' willingness to share appellants' attorneys fees, if as a result of their efforts, appellees inherited money from Leopold's estate that they would not have inherited otherwise.

tion; and further that the Court properly rejected appellants' alternative detrimental reliance theory.

Fleener's letter explicitly evinces his intent not to be contractually bound. The letter's very first sentence points up that Fleener is reviewing "topics of discussion *and possible solutions*" (Emphasis added). Again, Fleener stressed the nonbinding nature of the letter when he urged that an attempt be made by the family to settle the matters discussed and "formalize our understanding as soon as possible." Unfortunately for appellants, no such understanding ever materialized nor was any agreement ever formalized. *Cf. Dunhill Securities Corp. v. Microtherma Applications, Inc.*, 308 F.Supp. 195 (S.D.N.Y.1969). In *Dunhill*, the Court observed:

> It is no doubt true that, even where a formal writing is contemplated by the parties, a binding contract may nevertheless arise before the execution of the writing. See *Banking & Trading Corporation Ltd. v. Floete*, 257 F.2d 765 (2d Cir. 1958). The intention of the parties is crucial. In a case in which the parties *have agreed upon all material considerations and intend to become presently bound*, the later writing serves merely as a formal, convenient memorial of previously agreed upon terms. *Id.* at 198 [Emphasis added].

In the instant case, plainly there was no agreement as to the matters raised in Fleener's letter, and Fleener did not "intend to become * * * bound" until there was formalization of a settlement. More, since there is no ambiguity in Fleener's letter that he did *not* intend it to be a formal contract, but rather an expression of hope that the parties would settle and "formalize [their] understanding as soon as possible", the District Court was not called upon to resolve any ambiguity as to appellees' intention by resort to sources external to the letter. *Id.* at 197.

Even stretching the proposals in Fleener's letter to be construed as an offer, a response was requested by September 5, 1972 and as we have seen, there was no response to Fleener's proposals, nor was any understanding reached.

■ Respecting appellants' detrimental reliance theory, the undisputed evidence before the District Court shows conclusively that appellants could not have, and did not in fact, rely upon Fleener's "promise" to contribute to Jaffe Cohen's fees. Doubtlessly, appellants understood full well from the outset that appellees opposed participation in the payment of Jaffe Cohen's fees, and that the Fleeners had retained their own counsel for advice regarding the annulment proceeding and other matters involving Leopold's estate. Indeed, the September 1971 retainer agreement obligating appellants to pay Jaffe Cohen specifically acknowledged that Fleener did not wish litigation brought on his behalf and reconfirmed appellants' commitments as set forth in the letter of January 29, 1971. The short answer is appellants bound themselves to pay Jaffe Cohen's fee almost one year prior to receiving Fleener's "promise" to contribute. Moreover, in the September retainer agreement appellants not only agreed to pay Jaffe Cohen's fee, but acknowledged that the firm had already earned the fee and would be paid, even if the litigation were terminated by appellants. Stated differently, therefore, appellants were obligated to pay their attorney's fee whether or not they continued to retain Jaffe Cohen.

The Jaffe Cohen letter of April 1978, quoted *supra*, further confirms that appellants were fully committed to the firm notwithstanding any action taken by the appellees.

As a matter of law, appellants could not have relied upon Fleener's letter to their detriment since they were already fully committed to the Jaffe Cohen firm, and we hold that the District Court correctly rejected appellants' detrimental reliance theory.

In summary, appellants have raised no genuine issues of fact to be tried, and their causes of action as alleged in the complaint have no legal merit. Appellees' motions for dismissal and for summary judgment were

properly granted. Accordingly, the orders of the District Court are affirmed.