In re FLAGSTAFF FOODSERVICE
CORPORATION, Debtor.

FLAGSTAFF FOODSERVICE CORPORATION (Debtor-in-Possession), and Flagstaff Foods of New England, Inc. (Debtor-in-Possession), Plaintiffs,

v.

CONSOLIDATED FOODS CORPORATION and PYA/Monarch,
Inc., Defendants.

Bankruptcy No. 81 B 11430.
Adv. No. 81–5562A.

United States Bankruptcy Court,
S.D. New York.

Dec. 6, 1982.

Bell, Kalnick, Beckman, Klee & Green, New York City, for plaintiffs; Barry R. Fertel, New York City, of counsel.

Wilner, Ross, d'Incelli & Ashinoff and Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants; Reid L. Ashinoff, New York City, of counsel.

## DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PRUDENCE B. ABRAM, Bankruptcy Judge:

This adversary action was commenced on September 1, 1981 by the debtor, Flagstaff Foodservice Corporation ("FF"), and its affiliate, Flagstaff Foods of New England ("FN"), also a debtor in a separate proceeding pending in this Court (hereinafter collectively "Flagstaff") against Consolidated Foods Corporation ("CFC") and its wholly-owned subsidiary PYA/Monarch, Inc. ("Monarch") (hereinafter collectively "CFC/Monarch"). On October 7, 1981 CFC/Monarch filed an answer denying the allegations of the original three-count complaint and alleging as an affirmative defense that the complaint failed to state a claim upon which relief could be granted.

Subsequently after moving on November 4, 1981 for leave to file an amended complaint, Flagstaff on January 26, 1982 filed an amended complaint containing five counts which was endorsed with a jury trial demand.[1] Counts one and four of the amended complaint are new, although a question exists which is important only to the jury trial demand whether count four states a claim for relief not encompassed in the original complaint. Counts two, three and five are a reworking of the three counts in the original complaint. Count one of the amended complaint alleges that CFC/Monarch, a competitor in the New England area, made a written offer to purchase the New England operations of Flagstaff (the "New England operations"), which offer was alleged to have been duly accepted by Flagstaff, which was engaged in the institutional food service and and distribution industry.[2] Flagstaff claims that CFC/Monarch repudiated the agreement and that as a result of such breach, Flagstaff has sustained damages in the sum of $15 million.

Counts two, three and five, which reformulate the counts of the original complaint, seek damages as a result of CFC/Monarch's hiring of a group of approximately eleven Flagstaff salesmen from the New England operations.

Count two alleges that CFC/Monarch "entered into negotiations with plaintiffs for the purchase of the New England operations for the sole purpose of obtaining confidential information regarding the operations of plaintiffs, as well as specific information regarding the aforesaid [eleven] employees and their efforts on behalf of plaintiff" (Amended Complaint ¶ 17). It is alleged that CFC/Monarch acquired and used such information to the unfair detriment of Flagstaff by soliciting and hiring those employees. It is alleged that CFC/Monarch through its officers and agents were fully aware of Flagstaff's weakened financial condition and employed the New England operations salesmen in a calculated effort to injure Flagstaff's business. Furthermore, it is alleged that CFC/Monarch sought to engage in conduct designed to further weaken Flagstaff's already precarious financial position to enable CFC/Monarch to purchase the assets of the New England operations at a much lower price than CFC/Monarch has represented it was willing to pay in its offer. Damages of $25 million are sought in count two.

---

1. There is presently pending before the Court for resolution a dispute over plaintiffs' jury trial demand. The defendants allege that the demand was not timely made and that this Court should not exercise its discretion to grant the untimely request.

2. Flagstaff's operations are now limited to liquidation efforts.

Count three alleges that CFC/Monarch never intended to purchase the New England operations and that their written offer was made solely to obtain additional information regarding Flagstaff's operations, financial condition and the New England operations salesmen. This count alleges that Flagstaff would not have furnished such information but for the fact that Flagstaff was induced to do so by the false representations of CFC/Monarch. Damages of $25,000,000 plus $10,000,000 in punitive damages are sought.

The fifth count alleges that CFC/Monarch with intent

"to injure plaintiffs or their business wrongfully and maliciously induced plaintiffs' sales people to leave their employ with the plaintiff, and induce customers of plaintiffs to cease doing business with plaintiffs, notwithstanding demands by plaintiffs that such activities terminate, and that defendants not interfere with plaintiffs' contracts with plaintiffs' customers." Complaint at ¶ 33.

On this count, damages of $25,000,000 are sought.

The fourth count, which is new, recites the retention of Allen & Company by FF in or about April 1981, which was prior to the commencement of the Chapter 11 cases, for the purpose of offering the New England operations for sale. Allen & Company prepared and distributed to CFC/Monarch, among others, a detailed memorandum describing Flagstaff and its operations. It is alleged that CFC/Monarch executed written "confidentiality agreements" after they were contacted by Allen & Company about possible interest in Flagstaff and that CFC/Monarch breached those agreements when CFC/Monarch hired Flagstaff's salesmen. Damages of $25,000,000 are sought.

As permitted by Rules 712 and 756 of the Rules of Bankruptcy Procedure incorporating Federal Rules of Civil Procedure 12 and 56, prior to answering the amended complaint, CFC/Monarch moved for summary judgment dismissing the amended complaint. The purport of the motion is that each and every count of the amended complaint fails to state a claim for relief and/or that if a claim has been stated, it cannot be proved.

In support of the motion for summary judgment, the defendants have submitted 16 exhibits and several hundred pages of excerpts from the depositions of thirteen persons. Plaintiffs have submitted over a hundred additional pages from these depositions and that of a fourteenth person as well as additional exhibits. It appears to the Court that the parties have engaged in substantial pre-trial discovery prior to the submission of the summary judgment motion.

As required by Local Rule 3(g), Monarch submitted with their moving papers a statement of material facts not in dispute. Flagstaff submitted a counter-statement. However, the Court is unable to determine from Flagstaff's unparticularized counter-statement which items in the CFC/Monarch statement of material facts are in dispute. In light of this difficulty in determining which facts are in dispute, the Court has considered the facts as submitted by the defendants with respect to counts two through five, to which the bulk of the facts relate, in a light more favorable to the defendants than it might have otherwise done. Of course, the Court is not bound to accept the legal conclusions which are intermixed with the factual items. Considering all the facts and resolving all reasonable inferences in favor of CFC/Monarch with respect to counts two through five, this Court, for the reasons discussed below, denies the motion for summary judgment as to those counts. With respect to count one, there are no material relevant facts in dispute on the Court's view of the law, discussed below, and summary judgment is granted dismissing count one.

### DISCUSSION OF DISMISSAL OF COUNT ONE

■ Count one of the amended complaint, as stated above, seeks to recover for an alleged breach of contract by CFC/Monarch to purchase the New England operations. In addressing plaintiffs'

contention that CFC/Monarch breached their contract to purchase Flagstaff's New England operations, the Court must first determine whether a contract was ever entered into and therefore the Court first turns to the terms and nature of the CFC/Monarch offer of July 27, 1981, a copy of which is annexed to the amended complaint as Exhibit A, and annexed to this opinion as Exhibit 1 due to its significance to the entirety of the summary judgment motion. It is beyond the necessity of citation that absent a valid offer and acceptance, there can be no binding contract. Because the July 27 letter which forms the gravamen of the contract cause of action was drafted by CFC/Monarch, all reasonable inferences must be drawn in favor of Flagstaff, and all ambiguities resolved against CFC/Monarch.

 The first question for determination must be whether this letter constitutes a valid offer. In order for an offer to be valid it must be clear, contain all material elements, and be communicated to the offeree. The requirement of definiteness can be met other than by explicit expression in the contract. If a methodology for determining the open terms can be found within the four corners of the offer or contract, then such is sufficient. *Martin Deli v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981); *Brown Bros. v. Beam Construction,* 41 N.Y.2d 397, 393 N.Y. S.2d 350, 361 N.E.2d 999 (1977). *See e.g., American Cyanamid Co. v. Elizabeth Arden Sales Corp.,* 331 F.Supp. 597 (S.D.N.Y.1971) (letter agreement for sale of assets of a corporation contained all material terms even though price was based on a fixed formula, no closing date was stated, and letter did not define what accounting procedure would be used to "verify" the net worth).

With these principles in mind, the Court turns to the July 27 letter itself. No dispute exists that the offer was communicated to Flagstaff, the offeree. In the July 27 letter, CFC/Monarch states that it will purchase, for cash at a price to be fixed in accordance with certain formula, the warehouses, real estate, inventory, accounts receivable and fixed assets of the New England operations. The letter provides that the offer will remain open until August 14 and provides an explicit method for acceptance.

The letter also contained the following paragraphs:

"PYA [Monarch] will assume only those liabilities, if any, related to the Flagstaff New England Assets [the New England operations] which are agreed to and set forth in a definitive purchase agreement. The consummation of the purchase of the Flagstaff New England Assets by PYA is subject to the approval of the board of directors of Consolidated Foods Corporation (the next meeting of which is on August 27), a due diligence investigation of the Flagstaff New England Assets by the employees of PYA and the joint execution of a mutually acceptable purchase agreement.

"Among the subjects to be examined in the aforementioned due diligence investigation is whether there has been a serious break in the sales continuity of the Attleboro and Bloomfield warehouses as a result of Flagstaff's insolvency to the extent that the values of the Flagstaff New England assets should be reduced to an amount below their recorded values. PYA's concern about the sales continuity is due to the fact that several Flagstaff salesmen have notified PYA that they wish to explore employment opportunities with PYA in the New England area. PYA intends to meet with some of them for this purpose."

 Assuming *arguendo,* that the formulas and methodologies specified in subparagraphs 1 through 4 of the first paragraph of the letter are capable of being applied to determine a fixed purchase price for the New England operations, the letter still must fail as an offer because the paragraphs quoted above clearly indicate that this letter was merely an offer to negotiate, and as such it was not an offer to purchase capable of acceptance. For example, the first of the quoted paragraphs states that

CFC/Monarch will only assume the liabilities "which are agreed to and set forth in a definitive purchase agreement" and that the purchase was subject to "the approval of the board of directors," after a "due diligence investigation," and the "joint execution of a mutually acceptable purchase agreement." The second quoted paragraph likewise indicates that the letter was merely an offer to negotiate as it discusses the subjects to be examined in the due diligence examination, including "sales continuity" and CFC/Monarch's intention to explore employment opportunities with certain Flagstaff salesmen.

We are mindful of the fact that the letter states that CFC/Monarch "offers" (paragraph 1) to purchase, and in the last paragraph states that "this offer shall expire on August 14, 1981." Notwithstanding CFC/Monarch's terminology, essential terms and conditions remained open for determination, and as such there was no meeting of the minds. *Brown Bros. v. Beam Constructions, supra; Willmott v. Giarraputo,* 5 N.Y.2d 250, 253, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959); *Neiss v. Franze,* 101 Misc.2d 871, 422 N.Y.S.2d 345 (1979). This is not a case where the exchange of documents and negotiations thereon resulted in an enforceable contract, *V'Soske v. Barwick,* 404 F.2d 495 (2d Cir.1968), *cert. den.,* 394 U.S. 921, 89 S.Ct. 1197, 11 L.Ed.2d 454 (1969), or where a series of drafts were exchanged and the parties orally agreed on the terms of the draft, *International Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49 (2d Cir.1979). *See also Chromalloy American Corp. v. Universal Housing Systems,* 495 F.Supp. 544 (S.D.N.Y.1980). Rather, here there was a letter identifying material terms and elements yet to be agreed upon, and nothing further.

Any other interpretation would make the language providing for the execution of a mutually acceptable purchase agreement of no force and effect and effectively eliminate the words. The terms of the letter make it clear that it was merely an offer to negotiate, an outline of preliminary negotiating points. "It was but a step in the negotiations looking toward contracts which were to come into existence only upon their being signed by the parties." *Scheck v. Francis,* 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970). Until the time that such due diligence investigation was performed, and a mutually acceptable purchase agreement executed and approved, there was to be no binding agreement. "[W]hen the parties have clearly expressed an intention not to be bound until their negotiations have culminated in the execution of a formal contract, they cannot be held until that event has occurred. The necessary finality of assent is lacking." *S.S.I. Inv. Ltd. v. Korea Tungsten Min. Co., Ltd.,* 80 A.D.2d 155, 157–58, 438 N.Y.S.2d 96, 99 (1981) quoting *Brause v. Goldman,* 10 A.D.2d 328, 332, 199 N.Y.S.2d 606, 611 (1960), *aff'd* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

"The cumulative effect of the correspondence and conduct of these parties can only be categorized as indicative of an intent to conduct further negotiations. Since no formal contract was subsequently entered into, no binding legal relationship was ever established." (*S.S.I. Inv. Ltd. v. Korea Tungsten Min. Co., Ltd., supra.*)

Although undoubtedly such statements can be viewed as self-serving, the testimony of Thomas Nahm, the Vice President of Monarch, at pages 118 and 128 of his deposition, confirms this interpretation of the July 27 letter as does that of James Fidler, the President of Monarch (see for example page 53 of his deposition).

Thus, since there was no valid offer and thus no binding contractual relationship could arise, summary judgment is appropriate as to count one of the amended complaint.[3]

---

**3.** It is worth noting in considering Flagstaff's alleged acceptance of the purported offer that Flagstaff's acceptance of the offer was not made in the manner provided for in the contract and accordingly there was no valid acceptance. *See, Endres v. Buffalo Auto. Assn,* 29 Misc.2d 756, 217 N.Y.S.2d 460 (1961); *Spratt v. Paramount Pictures, Inc.,* 178 Misc. 682, 35 N.Y.S.2d 815 (1942). However, our decision need not rest on this ground in that we

## DISCUSSION OF DENIAL OF SUMMARY JUDGMENT AS TO COUNTS TWO THROUGH FIVE

Counts two through five will be discussed together as the Court views them as varying formulations of the same alleged wrong. Both the plaintiffs and the defendants have characterized counts two through five as involving "confidential information." Count four raises the question of the existence and effect of written confidentiality agreements between the parties on the hiring of the eleven salesmen. The Court is unclear on the record before it whether CFC/Monarch concedes the existence of signed confidentiality agreements although the Court believes that CFC/Monarch concedes the existence of the agreements but denies any implication that the facts create any claim for relief in connection with the agreements. As the record before the Court at this time is insufficient to permit a determination as to what was intended by the confidentiality agreements and since the Court is of the view as discussed below that a claim for relief has been stated for wilfull injury to the plaintiffs' business by the hiring of the eleven salesmen because of CFC/Monarch's position vis-a-vis Flagstaff prior to the time of the hirings, without regard to the existence of any rights derived from the confidentiality agreements, this Court is of the view that the confidentiality agreements would strengthen Flagstaff's claim for relief, but are not a necessary predicate for it and that summary judgment is inappropriate as to count four, as well as to counts two, three and five.

Viewed most favorably to the party moving for summary judgment, CFC/Monarch, the evidence indicates that prior to the commencement of the Flagstaff Chapter 11 cases, CFC/Monarch entered into negotiations to purchase the New England operations because CFC/Monarch needed expanded plant facilities, which the Flagstaff property in Attleboro, Massachusetts might be able to afford, and because the acquisition of the New England operations would have expanded their sales volume. While the negotiations were proceeding, and after CFC/Monarch had made an offer which Flagstaff viewed as unacceptable, Flagstaff filed their Chapter 11 petitions. The principal reason for filing the petitions seems to have been serious problems arising from Flagstaff's Perth Amboy, New Jersey operations and not problems arising out of the New England operations. Flagstaff believed the Chapter 11 filings would make no difference in the course of their negotiations with CFC/Monarch from the sale of the New England operations.

Notwithstanding the Chapter 11 filings and although various officers of CFC/Monarch have stated that the Chapter 11 filings caused them concern with respect to the accuracy of the information respecting the New England operations, CFC/Monarch, on July 27, 1981 made the renewed written "offer" for the New England operations which was discussed above. Although it is stated that the "offer" would remain open until August 14, CFC/Monarch urges that it withdraw the offer earlier. It is clear that the earliest time that the July 27 "offer" could be deemed to have been terminated was about 3 p.m. on Friday, August 7, 1981 (see page 94 of the deposition of James R. Carlson, Director of Corporate Development of CFC) and there is the possibility that withdrawal of the "offer" was not effectively communicated to Flagstaff earlier than the first part of the following week.

The facts as regards the hiring of the Flagstaff salesmen by defendants are undisputed in broad outline. After they learned that the Chapter 11 petitions were to be filed, a group of the salesmen led by Edmund Lanni and Vincent Cerbo decided on their own to look as a group at possible other employment opportunities. The group was troubled by Flagstaff's financial problems, was not impressed with top management of Flagstaff and was concerned about continued ability to service the cus-

have concluded that the claim for breach of contract must be dismissed because there was never an offer capable of acceptance. Like-

wise, it is unnecessary to pass upon Flagstaff's contention that the offer was wrongfully terminated.

tomers they had as Flagstaff salesmen, particularly ability to deliver a reasonable percentage of goods ordered. The group contacted at least three competitors of Flagstaff, including CFC/Monarch and met as a group with those competitors on several days in succession in late July and met with CFC/Monarch on July 30. Earlier on July 30 the CFC/Monarch people had met with the Flagstaff people to discuss the July 27 letter and that meeting had ended on an unsatisfactory note. CFC/Monarch did not conceal their intention to meet with the salesmen from Flagstaff at the July 30 meeting and their intention had been expressed in writing in the July 27 "offer." At the July 30 meeting Flagstaff voiced strong objections to the upcoming meeting with its salesmen.

CFC/Monarch concedes that after they learned the Chapter 11 petitions were to be filed, during the week of July 20 and beginning on Monday (the Flagstaff Chapter 11 petitions were filed on Tuesday, July 21), William Assadorian, one of their employees, contacted at least four of the Flagstaff salesmen at their homes to find out "how they were doing." He had no close personal relationships with any of the four. Mr. Assadorian's memoranda with respect to the telephone calls state that he did not offer any of the four jobs at that time (see Exhibit 15 to the February 16, 1982 of Affidavit of Reid L. Ashinoff). As is apparent from a reading of the transcripts of three of the persons he contacted, Cerbo, Lanni and Smith, all understood that they were being courted. At least Cerbo and Lanni visited the Monarch facilities on August 6 through the auspices of Assadorian. Assadorian (whose actions appear only through the words of others as no deposition of his was offered as part of the summary judgment papers) was apparently in constant communication during these tense few weeks with top management of CFC/Monarch as to the hiring of the Flagstaff salesmen. Nahm states at page 153 of his deposition that he told Assadorian to hold off hiring the salesmen. On Saturday, August 8, Assadorian again contacted Nahm, who gave him the go-ahead to hire

the salesmen "because we didn't have a deal." Nahm at 152.

At the meeting CFC/Monarch had with the group of Flagstaff salesmen on July 30, the salesmen were not told of the negotiations with Flagstaff. In explanation, Fidler, the president of Monarch stated:

"The next question they asked were we in negotiations with Flagstaff, and that had been told we were in the process of acquiring, and I explained to them I wasn't in any position to discuss that either way nor did I intend to.

Q Why did you give that response?

A Because I didn't feel that I should discuss that with them.

Q Why not?

A Because I think this was a confidential part of the discussion with Flagstaff."

During the course of their negotiations with Flagstaff and on July 16, George Maloney, the President of FN, had met with Fidler at the Attleboro facilities and had, among other topics, discussed the sales personnel in detail. CFC/Monarch had information as a result of its negotiations with Flagstaff which allowed it to determine that there was relatively little overlap between the two companies' customers. This is the broad factual outline against which the Court has measured the claim for relief.

On a motion for summary judgment, the Court should draw all inferences against the moving party. Here the Court believes that it is reasonable to infer that at or about the time they first learned the Chapter 11 cases were to be filed CFC/Monarch realized that they had the possibility of obtaining the Flagstaff New England operations sales volume by hiring the Flagstaff salesmen without the necessity of purchasing the Flagstaff assets and understood that if they were able to do so that Flagstaff's New England operations might well not withstand the blow. One fact from which this can be inferred is the approach CFC/Monarch took to handling the July 30 meeting with Flagstaff salesmen. Had CFC/Monarch seriously believed that it was

likely to acquire the Flagstaff New England operations through purchase at that time, it would seem that CFC/Monarch would have approached the meeting with the Flagstaff salesmen openly as a prospective employer and asked those people to stay on with Flagstaff until the transaction could be completed. Another fact of significance are the activities of Assadorian, which began after CFC/Monarch learned the petitions would be filed but before they were filed.

■ CFC/Monarch asserts, as an essential element to their position that no claim for relief exists, that the type of relationship which existed between Flagstaff and its salesmen precludes recovery. It is not claimed that the Flagstaff salesmen were subject to formal employment contract, either written or oral, nor is it claimed that the employment relationship was to terminate on a fixed date. The law classifies such relationships where no contractual bonds exist as "employment at will." *Harley & Lund Corp. v. Murray Rubber Co.,* 31 F.2d 932, 934 (2nd Cir., 1929) *cert. den.,* 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929); *Motorola, Inc. v. Fairchild Camera and Instrument Corp.,* 366 F.Supp. 1173 (D.Ariz. 1973); *A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 375, 165 N.Y.S.2d 475, 480, 144 N.E.2d 371, 375 (1957); *Watson v. Gugino,* 204 N.Y. 535, 541, 98 N.E. 18, 20 (1912).

■ Employees at will are free to leave their employ at any time, and likewise, employers are free to discharge employees at will at any time. *Harley & Lund Corp. v. Murrary Rubber Co., supra; A.S. Rampell, Inc. v. Hyster Co., supra; Krause v. Gardner,* 99 N.Y.S.2d 592 (1950). Because both the employees and the employers are free to terminate the employment relationship at any time then, *a fortiori,* a competitor is free to negotiate and hire away the employees at will of his competitor. *Harley & Lund Corp. v. Murray Rubber Co., supra; Krause v. Gardner, supra.* In *Triangle Film Corp. v. Artcraft Pictures Corp.,* 250 F. 981, 982 (2d Cir.1918), Judge Learned Hand, in determining whether an employee breached his employment contract by ac-cepting employment with another, held that the relationship was one of employment at will, and as such, the employee was free to leave at his pleasure. Judge Hand went on to state:

> "Nobody has ever thought, so far as we can find, that in the absence of some monopolistic purpose everyone has not the right to offer better terms to another employee, so long as the latter is free to leave. The result of the contrary would be intolerable, both to such employers as could use the employee more effectively and to such employees as might receive added pay. It would put an end to any kind of competition." *Id.*

Notwithstanding the language just quoted, the courts of this state and most others, have limited this doctrine by requiring that the hiring competitor have acted without malice or an intent to injure the business of the former employer. *See, e.g., American League Baseball Club of N.Y. v. Pasquel,* 187 Misc. 230, 63 N.Y.S.2d 537 (1946) (malicious attempts to induce employees to terminate their employment are illegal even though the employment was terminable at will); *Truax v. Raich,* 239 U.S. 33, 38, 36 S.Ct. 7, 9, 60 L.Ed. 131, 134 (1915) (employment at will does not give the right to third persons to unjustifiably interfere with the employment relationship). In *Coleman & Morris v. Pisciotta,* 279 A.D. 656, 657, 107 N.Y.S.2d 715, 716 (1951), the court enunciated the general rule that inducing another's employees at will to terminate their employment "is not actionable, at least unless the purpose of the actor was solely to produce damage, or unless the means employed were dishonest or unfair." There are no hard and fast rules for determining what constitutes just cause in seeking to hire away employees of one's competitors, or conversely, what amounts to acting with malicious intent. "No ironclad rules as to the type of conduct which is permissible can be stated, since the spectrum of activities in this regard is as broad as the ingenuity of man itself." *Bancroft-Whitney Co. v. Glen,* 64 Cal.2d 327, 411 P.2d 921, 935, 49 Cal.Rptr. 825, 839 (en banc 1966). Thus, CFC/Mon-

arch's state of mind as evidenced through its employees is a critical focus of inquiry. The Court must also determine the impact on these issues of the relationship which existed between Flagstaff and CFC/Monarch as a result of their negotiations for the time preceding and including CFC/Monarch's hiring of the Flagstaff salesmen.

■ As set out in detail earlier, CFC/Monarch, which was a competitor of Flagstaff in the New England area, entered into negotiations to purchase the New England operations prior to Flagstaff's commencement of the Chapter 11 cases. The Chapter 11 petitions were filed during the negotiations. Despite the filing the negotiations continued. Although the negotiations ultimately proved to be unsuccessful, it is this "competitor-buyer-seller" relationship that furnishes the basis for counts two through five of the amended complaint, and may indeed be the operative factor in this dispute. While both parties devoted substantial argument to whether CFC/Monarch received any "confidential information," this Court does not see the issues turning on whether any individual piece of information was truly "confidential." Suffice it to say that during the negotiations information was exchanged which in the aggregate would not have been freely available to CFC/Monarch and which would not have been made available to them by Flagstaff but for the negotiations and these exchanges establish a relation of confidence between the parties. *See, A.S. Rampell, Inc. v. Hyster Co., supra.* While this relationship might not rise to the level of a fiduciary relationship (*see Bancroft-Whitney Co. v. Glen, supra*) this Court believes that in light of the negotiations going on between the two companies and the information exchanged in connection therewith and the fact that CFC/Monarch had special knowledge of Flagstaff's financial problems and that both companies were in competition for the same customer dollar, a higher duty of care attached than had the relationship been one of mere competitors having no other relationship. *See Wear-Ever Aluminum v.*

*Townecraft Industries,* 75 N.J.Super. 135, 182 A.2d 387 (1962).

■ The purpose of summary judgment is to determine whether there are facts in dispute which would warrant a trial, and to avoid unnecessary trials when there are no real issues to try. *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969). Rule 56 of the Federal Rules of Civil Procedure, made applicable here by Rule 756 of the Rules of Bankruptcy Procedure, provides that summary judgment is properly granted only when, after reviewing the entire record, it is clear "that there is no genuine issue as to any material fact." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980). The court, in reviewing the evidence on a motion for summary judgment, must resolve all ambiguities in favor of the party against whom summary judgment is being asserted. *Quinn v. Syracuse Model Neighborhood Cor., supra* at 445. *See, United States v. Diebold, Ins.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962); *accord* 6 Moore's Federal Practice ¶ 56.02 (2d ed. 1976). The proponent of the motion for summary judgment has the burden of showing absence of a material issue of fact. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 Ed.2d 142, 154 (1970). If the moving party does not establish that there is no genuine issue as to the relevant facts, then summary judgment is not appropriate notwithstanding that the opposing party has not offered proof supporting its position. *The First National Bank of Boston v. The Overmeyer Co.,* 10 CBC 389 (S.D.N.Y.1976). If the moving party carries its preliminary burden, then it is incumbent upon the opposing party to come forth with evidence supporting its position. The opponent cannot simply rely on the contentions of its pleadings, *United States v. Pent-R-Books, Inc.,* 538 F.2d 519, 529 (2d Cir.1976), *cert. den.,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977), nor can it rest on the possibility that something might be elicited on cross-examination which might raise a question of fact. *First National Bank of*

*Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968); *Quinn v. Syracuse Model Neighborhood Corp., supra* at 445; *Buckley v. Vidal,* 327 F.Supp. 1051, 1055 (S.D.N.Y.1971).

■ Summary judgment is generally inappropriate when there is a reliance on circumstantial evidence necessary to prove a state of mind *Freedman v. Beneficial Corp.,* 406 F.Supp. 917, 921 (D.Del.1975). *But cf., Feick v. Fleener,* 653 F.2d 69, 77 (2d Cir.1981) (merely because issues involve motive and intent does not preclude granting of summary judgment); *Applegate v. Top Associates, Inc.,* 425 F.2d 92 (2d Cir.1970) (opponent of summary judgment must establish dispute as to relevant facts even where the cause of action is one involving an elusive conspiracy). The Advisory Committee Notes on the 1963 amendment to Rule 56 states as follows:

> Where an issue as to a material fact cannot be resolved without observation of the demeanor of the witnesses in order to evaluate their credibility, summary judgment is not appropriate. Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.

■ In applying these general principles on summary judgment to counts two through five of the amended complaint, the Court is convinced on the basis of the deposition transcripts and documents offered by the defendants that material issues of fact exist, that therefore plaintiff is entitled to a trial and that summary judgment must be denied as to these counts. It is important to keep in mind that as the Court is only deciding whether to grant summary judg-

ment, it is not necessary at this point to determine which party would ultimately prevail on the merits. This Court cannot say with a reasonable degree of certainty that as a matter of law CFC/Monarch acted without malice. It is certainly possible that the ultimate trier of fact will determine that CFC/Monarch's actions during and shortly after the course of negotiations which resulted in its ability to hire eleven members of Flagstaff's total sales force of thirty-five are, as a matter of law, actionable. Making calculated judgments about group behavior, cannot on the facts of this case, be said as a matter of law, to not be unfair or dishonest. *See Coleman & Morris v. Pisciotta, supra,* 279 A.D. at 657, 107 N.Y.S.2d 715. Flagstaff should not be denied the opportunity to prove that "[t]he result reflects an acute awareness of predictable group reaction to a created situation." *Wear-Ever Aluminum v. Townecraft Industries,* 182 A.2d at 393. Defendants' state of mind will be a critical point of inquiry, but it should not be thought that summary judgment is being denied simply because an issue as to state of mind exists. "On a motion for summary judgment the court is not to determine credibility, but whether there exists a factual issue, or if arguably there is a genuine issue of fact." *Capelin Assoc. v. Globe Mfg. Corp.,* 34 N.Y.2d 338, 341, 357 N.Y.S.2d 478, 314 N.E.2d 413 (1974).

## CONCLUSION

Summary judgment dismissing count one of the amended complaint is hereby granted. Summary judgment as to counts two through five of the amended complaint is hereby denied.

SO ORDERED.

APPENDIX

EXHIBIT 1

PYA/MONARCH, INC.
POST OFFICE BOX 1569
GREENVILLE, SC 29602

July 27, 1981

Flagstaff Foodservice Corp.
c/o Mr. Mark Kesselman
Allan & Company
711 Fifth Avenue
New York, New York 10022

Gentlemen:

PYA/Monarch, Inc., a wholly-owned subsidiary of Consolidated Foods Corporation ("PYA"), hereby offers to purchase for cash the warehouses and adjacent real estate, inventory, accounts receivable and fixed assets related to the business of the Flagstaff Foodservice operations located at Attleboro, Massachusetts, and Bloomfield, Connecticut ("Flagstaff New England Assets"), at the purchase price and subject to the conditions set forth below.

1. Warehouses and appurtenant real estate at a price equal to the market value determined by averaging the appraisals of the value of such properties made by three real estate appraisers — one appraiser selected by PYA, one appraiser selected by Flagstaff and the third appraiser selected by the appraisers so selected by the parties.

2. Inventory in the warehouses or in transit, at a price equal to cost or market, whichever is lower.

3. Accounts receivable, less a reserve adequate for bad debts, which are less than 90 days outstanding, at a price equal to the aggregate book value thereof (such amount being payable at the closing). With respect to accounts receivable which are over 90 days outstanding, PYA shall remit to Flagstaff, in 30 day increments after closing, the actual amounts collected, if any, less 5% of such amounts as a collection fee.

4. Fixed assets, at net book value.

PYA will assume only those liabilities, if any, related to the Flagstaff New England Assets which are agreed to and set forth in a definitive purchase agreement. The consummation of the purchase of the Flagstaff New England Assets by PYA is subject to the approval of the board of directors of Consolidated Foods Corporation (the next meeting of which is on August 27), a due diligence investigation of the Flagstaff New England Assets by the employees of PYA and the joint execution of a mutually acceptable purchase agreement.

Among the subjects to be examined in the aforementioned due diligence investigation is whether there has been a serious break in the sales continuity of the Attleboro and Bloomfield warehouses as a result of Flagstaff's insolvency to the extent that the values of the Flagstaff New England Assets should be reduced to an amount below their recorded values. PYA's concern about the sales continuity is due to the fact that several Flagstaff salesmen have notified PYA that they wish to explore employment opportunities with PYA in the New England area. PYA intends to meet with some of them for this purpose.

You may respond to this offer by either writing or telephoning Thomas Nahm, Vice President — Northeast Region Development of PYA/Monarch, 201 Beacham Street, Everett, MA 02149, (617) 389–3300. This offer shall expire on August 14, 1981.

Yours very truly,
PYA/MONARCH, INC.

By: Gordon H. Newman
 Gordon H. Newman
 Vice President