75 N.J. Super. 135 (1962)
182 A.2d 387
WEAR-EVER ALUMINUM, INC., A CORPORATION OF THE STATE OF DELAWARE, PLAINTIFF,
v.
TOWNECRAFT INDUSTRIES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided June 14, 1962.
*137 Mr. David B. Buerger of the Pennsylvania Bar argued pro hac vice for plaintiff (Messrs. Stryker, Tams & Dill, attorneys; Mr. William L. Dill, Jr. of counsel; Messrs. Buchanan, Ingersoll, Rodewald, Kyle & Buerger of the Pennsylvania Bar, on the brief).
Mr. Carmen M. Belli, attorney for defendant.
PASHMAN, J.S.C.
The plaintiff, Wear-Ever Aluminum, Inc., a Delaware corporation, is engaged in the business of manufacturing and selling aluminum cooking utensils, crystal, china and cutlery. The actual marketing of these various items is done by three special divisions: the Wear-Ever Division sells aluminum cooking utensils, the Cutco Division sells cutlery, and the West Moreland Sterling Silver *138 Division sells the remainder of the plaintiff's products. The division with which we are concerned is Wear-Ever.
Wear-Ever's marketing arrangement is such that the aluminum cooking utensils which it handles are sold directly to the consumer by house-to-house salesmen known as distributors. The distributor is given a list of names from a reference program maintained by Wear-Ever and he then calls on the various housewives, shows his product, makes a sale  if successful  and secures additional references. It is upon the distributors' shoulders that the ultimate financial success of the Wear-Ever Division actually depends. The distributor being the liaison man between Wear-Ever and the consumer is as valuable an asset as the product itself.
The relationship between Wear-Ever and its distributor, while contractual, is not that of employer-employee. Rather, each distributor is an independent contractor and the company permits him, by an express contractual provision, to devote as much time as he wishes to any other business which he may have. With respect to duration, the contract provides that the contractual relationship will automatically renew "unless prior to December 31 of any year either party notifies the other to the contrary."
The distributor's main, and sometimes his sole, contact with Wear-Ever as an entity arises out of his relationship with an individual known as a "dealer." It is the dealer who takes the distributor out into the field and teaches him his trade. These lessons are supplemented by sales meetings, drill classes and daily checkups. The relationship between dealer and distributor, as testified to by John Ogden, national salesman of Wear-Ever Aluminum, Inc., is a "very close relationship, which is maintained through [the] checkup program, and the fact that he has brought him into the business and taught him how to sell and make money."
The dealer, like the distributor, has a contract with the plaintiff and is an independent contractor and not an emtechniques in the solicitation of orders for the sale of its ployee. The dealer's job is "to advise distributors on selling *139 Wear-Ever Specialties" for a designated territory. A dealer is compensated for his work by overriding commissions on sales made by distributors within his group. Thus, the earnings of a dealer are directly proportional to the volume of sales made by the distributors under his control and direction.
The next individual in the plaintiff's organization is the district manager. His "chief function is the location (and) development of field dealers, and to advise and work with the field dealer and dealer force." Unlike the distributors and dealers who sign contracts and are not employees but independent contractors, the district manager has an oral agreement with the plaintiff and is a full-time employee. He usually has one or two assistant managers working under him, and the remuneration for this managerial group depends on the volume of business which the dealers and distributors are able to procure.
The necessity for the somewhat lengthy explanation of the plaintiff's selling organization arises from the nature of the plaintiff's action. Stated very simply, the plaintiff alleges that the defendant, Townecraft Industries, Inc., tortiously pirated approximately 35 members of its Quaker City Division sales force; that as a result of the defendant's interference with the plaintiff's contractual and advantageous relations with these men, the morale of distributors remaining with Wear-Ever became low and 43 more individuals terminated their employment with the plaintiff. The nature and scope of relief sought by the plaintiff, to use its own words, is to enjoin "the defendant, its officers, employees, agents, and all other persons acting under its direction or in concert with it * * * from interfering in any manner with the employment and contractual and representative relationships between the plaintiff and its employees, distributors, and dealers who are associated and employed in the plaintiff's Quaker City Division in Philadelphia, Pennsylvania, or elsewhere." It further seeks: (a) to enjoin the defendant from inducing or attempting to induce the plaintiff's *140 employees and distributors from terminating their employment or contractual obligations with the plaintiff, or from inducing the cessation of solicitation of orders for the plaintiff's products; (b) an injunction enjoining the defendant from employing or continuing to employ (for a period of one year) any persons associated with the plaintiff's Quaker City Division on November 1, 1960; and (c) a declaration that all contracts for employment or representation which the defendant may have made since November 1, 1960, which resulted from the unlawful inducements (made by the defendant, its officers or employees) are void.
The conduct of the defendant and the factual picture during the material period in question, i.e., November and December 1960, were as follows: Wear-Ever's Quaker City Division was, and is, engaged in the sale of cooking utensils to consumers in Philadelphia and its surrounding suburban area. The manager of this division in November 1960 was Daniel Eisenfeld. Under him were Robert Pawson and Dexter Huffman, who were assistant managers; Bernie Solomon, James Kelly, Mel Atlin and Jerry Ferm, who were dealers and/or field dealers, and approximately 80 distributors, a little more than half of whom were actively engaged in the sale of aluminum cooking utensils.
Some years prior to November 1960 defendant, through its vice-president, Michael Nakash, a former employee of Wear-Ever, carried on a sporadic campaign in various cities throughout the United States, recruiting Wear-Ever personnel to come to work for Townecraft. The campaign consisted, in part, of telephone calls, social visits, dinners and the mailing of information about the defendant to Wear-Ever employees. In November of 1960 the campaign took on new dimensions and a concentrated effort was made to "proselyte" Wear-Ever employees, dealers and distributors.
The key man to the success of defendant's program was Daniel Eisenfeld. Aside from the fact that he was an experienced and capable district manager, he had the trust *141 and confidence of his sales force and was able to lead and mold them in the direction contemplated by the defendant's president, Henry Zadikoff, and vice-president, Michael Nakash. To achieve the desired end, Eisenfeld called a daytime meeting at the Cherry Hill Inn in Haddonfield, New Jersey, on November 17, 1960. Present at the meeting were Messrs. Eisenfeld, Atlin, Kelly, Huffman, Solomon, Ferm, Pawson, Zadikoff and Nakash. Relative to this occasion, I find as a fact that the sole purpose for the meeting was to convince the Wear-Ever men, other than Eisenfeld who was already, verbally, defendant's zone manager, to come to work for Townecraft. I find, further, that none of these men asked to come, but rather, Eisenfeld asked them to attend.
As a result of the Cherry Hill meeting, all of the former key men in Wear-Ever's Quaker City Division signed either dealer or regional manager contracts with the defendant, and Eisenfeld signed each contract as zone manager. That night, after the close of the meeting, the group went back to Wear-Ever's Lancaster Avenue office in Philadelphia where they were met by approximately 10 to 20 Wear-Ever distributors. These men were told of the mass exodus of the higher echelon members of the team and, being group-conscious, followed the lead of their superiors. Defendant was well prepared for the distributor change-over, as is evident from the fact that each man was issued Townecraft samples the same night. The samples had been "conveniently" driven into Pennsylvania from defendant's plant in Ridgefield, New Jersey.
New Jersey's position with respect to the general principles to be applied in the area of interference with contractual and advantageous relations was cogently expressed by Justice Heher in the oft-cited case of Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 587-589 (E. & A. 1934), where he said:
"`Merely to persuade a person to break his contract, may not be wrongful in law or fact. * * * But if the persuasion be used *142 for the indirect purpose of injuring the plaintiff, or of benefiting the defendant, at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and * * * a wrongful act, and * * * an actionable act if injury ensues from it.'
* * * While a trader may lawfully engage in the sharpest competition with those in a like business, by offering extraordinary inducements, or by representing his own goods to be better and cheaper than those of his competitors, yet when he oversteps that line and commits an act with the malicious intent of inflicting injury upon his rival's business, his conduct is illegal, and if damage ensues from it the injured party is entitled to redress. And it does not matter whether the wrongdoer effects his object by persuasion or by false representation. The courts look through the instrumentality or means employed to the wrong perpetrated with the malicious intent, and provides the remedy to redress that wrong. * * *
Self-enrichment or fraternal interest, and not personal ill will, may well have been the motive. But it is malice nevertheless. While ill will toward a person is malice in its common acceptation or popular sense, in the technical, legal sense it is the intentional doing of a wrongful act without justification or excuse. * * * And a `wrongful act,' within the intendment of this definition, is any act which, in the ordinary course, will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right. * * *
Justification connotes just, lawful excuse; it excludes malice. Malicious interposition is unjustifiable in the legal sense. * * * [T]he modern English doctrine is that an intent is wrongful if malicious. * * * And malice may be inferred from the absence of just cause or excuse. * * * If the challenged action were taken for the indirect purpose of doing injury to appellant, or of benefiting respondents at the former's expense, it is a wrongful act, unless done in the exercise of an equal or superior right, and therefore a malicious act, and actionable. * * *
The justification must be `as broad as the act, and must cover not only the motive and the purpose, or, in other words, the object sought, but also the means used.' * * * `The weapons used by the trader who relies upon this right [of competition] for justification must be those furnished by the laws of trade, or at least must not be inconsistent with their free operation. No man can justify an interference with another man's business through fraud or misrepresentation nor by intimidation, obstruction, or molestation.' This right to pursue one's business without such undue interference, and the correlative duty, are fundamentals of a well-ordered society. They inhere basically in the relations of those bound by the social compact. They have their roots in natural justice. * * *" *143 See also Newark Hardware, etc., Co. v. Stove Mfrs. Corp., 136 N.J.L. 401, 404 (Sup. Ct. 1948), affirmed per curiam, 137 N.J.L. 612 (E. & A. 1948); and Schechter v. Friedman, 141 N.J. Eq. 318, 324-325 (E. & A. 1948).
Since some of the defendant's recruiting of the plaintiff's sales force took place in Pennsylvania, it should be noted that that jurisdiction is in accord with New Jersey's position in the area of interference with contractual and advantageous relations. Thus, as the highest court in Pennsylvania held in the recent case of Capecci v. Liberty Corp., 406 Pa. 197, 202, 176 A.2d 664, 666 (Sup. Ct. 1962):
"`* * * [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.'"
Accord: Kraemer Hosiery Co. v. American Federation of F.F.H.W., 305 Pa. 206, 157 A. 588 (Sup. Ct. 1931); Caskie v. Philadelphia Rapid Transit Co., 321 Pa. 157, 184 A. 17, 106 A.L.R. 318 (Sup. Ct. 1936); Klauder v. Cregar, 327 Pa. 1, 192 A. 667 (Sup. Ct. 1937); and Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (Sup. Ct. 1957).
The defendant takes the position that any conduct on its part was absolutely privileged in view of the fact that it is a competitor of the plaintiff. Defendant also argues that the contractual relationship between the plaintiff and its former dealers and distributors is not entitled to judicial protection since these contracts were terminable at will.
The weakness of the defendant's argument concerning its so-called privilege arising from competition becomes apparent upon an investigation of the individuals for whom the plaintiff and defendant compete. It is uncontroverted that both compete for the same customer dollar. Both also compete for salesmen or distributors. The difference between the companies lies in the source of this competition. While *144 the plaintiff does compete with the defendant for distributors from a general market of men in other jobs, it does not compete with the defendant in the recruitment of distributors from competitors in the trade. Expressed differently, the plaintiff does not engage in a planned campaign of mass recruiting from its competitors; Townecraft does.
The attempted use by the defendant of its conclusion that it has a right to recruit Wear-Ever men actually begs the question, which is whether Townecraft does have a right to recruit. The answer to this question depends, in turn, upon a scrutinization of the defendant's conduct in view of the circumstances existing at the time such conduct took place.
As has been mentioned previously, defendant's program of mass recruiting from Wear-Ever achieved the ultimate in success, insofar as the defendant was concerned, on or about November 17, 1960, with the Cherry Hill Inn meeting and the events which subsequently followed. Although Nakash testified that he and Zadikoff left the room to let the men make up their own minds after a mature consideration of the problem, it is a fact that their recruiting agent, Eisenfeld, remained behind to lead the discussion. The presence of this "hidden persuader," together with the fact that Eisenfeld never told the men that he was verbally employed by the defendant, supports the assumption, adequately proven in other testimony offered by the plaintiff, that the decision to leave the plaintiff for defendant, was not that of the individuals independently. Eisenfeld deftly used the group-mindedness of his associates to sign them up for the defendant and then this feeling was filtered down to the distributors who met the keymen at the plaintiff's Lancaster office. The result reflects an acute awareness of predictable group reaction to a created situation.
The fact that the distributors' and dealers' contracts with the plaintiff were terminable at will cannot and does not provide the basis for justification where a third party tortiously interferes with an employment relationship. See, e.g., Noice, Adm'x v. Brown, 39 N.J.L. 569, 572 (Sup. *145 Ct. 1877); and Brennan v. United Hatters, 73 N.J.L. 729, 743 (E. & A. 1906). Justification must be found in facts independent of the nature of the relationship which the law affords protection. The right to terminate a contract at will is one which is peculiarly personal to the contracting parties, and a stranger to the contract may not exercise his will in substitution for the will of either of the parties to the contract.
In addition to the contractual relationship between the plaintiff and its dealers and distributors, a broader advantageous relationship arises out of the group arrangement of the plaintiff's sales organization. The relationship is that between distributor, dealer, manager and company and is entitled to the same protection as any relationship which is founded on contract. See Feller v. Local 144, International, etc., Union, 121 N.J. Eq. 452, 455-456 (E. & A. 1937). Cf. Louis Schlesinger Co. v. Rice, 4 N.J. 169 (1950); Sustick v. Slatina, 48 N.J. Super. 134 (App. Div. 1957); and Brenner & Co. v. Perl, 72 N.J. Super. 160, 166 (App. Div. 1962). To deny such a relationship judicial protection merely because a written document is lacking, is to place form on an unwarrantably higher pedestal than substance. The relationship is of great value to the company, which painstakingly develops, and has developed, a closely-knit team of individuals who market its product. Likewise, the individuals on each level are compensated for their efforts on the basis of volume of sales. Unjustified officious intermeddling with this legally obtained relationship must never have the judicial stamp of approval.
The conduct of the defendant, as evidenced by the actions of Eisenfeld and Nakash, was designed and intended to promote the interests of the defendant at the expense of the plaintiff. The injury suffered by the plaintiff, i.e., loss of man power and loss of revenue, was not an incidental consequence of the defendant's wrongful act; it was the ultimate consequence envisioned and planned for by the defendant. The defendant's desire was to build up its sales *146 force, and Wear-Ever was as good a source as any to pick from. As Eisenfeld testified, in what is one of the only credible statements made by him:
"Q. Since you have been working for Townecraft, have you talked to persons who are Wear-Ever distributors or employees, in an effort to get them to leave Wear-Ever for Townecraft?
A. Yes, I have.
THE COURT: Employees and distributors, Mr. Eisenfeld. You say you spoke to employees and distributors?
THE WITNESS: Yes.
Q. Are you continuing to do that?
A. Yes, sir.
Q. And will it be part of your job to recruit Wear-Ever personnel as long as you are in your present occupation?
A. Yes, sir."
Although factually distinguishable from the instant case, the following language of Chancellor Pitney in Jonas Glass Co. v. Glass Bottle Blowers' Association, 77 N.J. Eq. 219, 223 (E. & A. 1908) is apropos:
"The conduct of defendants in using coercion in some cases and persuasion in others in order to bring about breaches of the contracts of personal service existing between complainant and some of its employe's  defendants having * * * full notice of the existing employment  was unlawful and actionable * * *.
And the same is true of conduct whose object and purpose were to bring about a termination of the relation of master and servant between the complainant and its employe's in cases where there was no binding contract of service, but a mere service at will. * * *" (Emphasis added)
Cf. also Amatrudi v. Watson, 19 N.J. Super. 67, 69-70 (App. Div. 1952).
The defendant's assertion that the type of conduct which it engaged in is prevalent in the trade, was not supported by the testimony offered in its behalf. In any event, even if the defendant had established that the custom in the trade was to pirate salesmen from competitors, this court would not permit such a custom to justify and legitimatize what otherwise would be tortious conduct. The role *147 of the court is to raise the standard of business morality and care, not judicially to sanction tortious activities. Higher standards benefit and protect both the innocent members of an industry and the general public.
In American League Baseball Club of N.Y. v. Pasquel, 187 Misc. 230, 63 N.Y.S.2d 537 (Sup. Ct. 1946), a case involving a fairly similar situation to the one presently before the court, the New York Supreme Court granted a preliminary restraint against actions by the defendant designed to induce certain of the plaintiff's players to repudiate their contracts and come to work for the defendant. The court said, at pages 538-539 of 63 N.Y.S.2d:
"Attempts of the defendants to induce plaintiff's players to leave their employment with the plaintiff are wrongful and illegal under well-settled principles of law, and this is so regardless of whether the contracts between the plaintiff and its players would be enforcible in actions between the parties to the contracts. * * * Malicious attempts to induce employees to leave their employer are illegal even if there is no contract for a definite term between them and their employer and their employment is terminable at will. * * *"
Cf. generally, Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 112 F.2d 101 (8 Cir. 1940); Morgan's Home Equipment Corp. v. Martucci, supra, 136 A.2d, at p. 847; French Bros. Bauer Co. v. Townsend Bros. Milk Co., 21 Ohio App. 177, 152 N.E. 675 (Ct. App. 1925); Herman v. First Merrick Corporation, Sup., 99 N.Y.S.2d 119, 121-122 (Sup. Ct. 1950); and Buxbom v. Smith, 23 Cal.2d 535, 145 P.2d 305, 310 (Sup. Ct. 1944). Compare Harley & Lund Corporation v. Murray Rubber Co., 31 F.2d 932 (2 Cir. 1929), cert. denied 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929).
The conduct of the defendant in this case, while factually distinguishable from the conduct of an employee who wrongfully pirates customers of his employer during his employment relationship, see, e.g., United Board & Carton Corp. v. Britting, 63 N.J. Super. 517 (Ch. Div. 1959), has the capacity to yield the same drastic effect on *148 the business of the employer-victim. A business such as the plaintiff's, i.e., direct retail selling, suffers as much from lack of qualified and trained salesmen as it does from lack of customers. In each case the individual or organization which tortiously brings about the result should respond in damages and desist from such conduct in the future.
Since it is the opinion of the court that the defendant maliciously interfered with the plaintiff's existing contractual and advantageous relations with its distributors and dealers, and its advantageous relations with its assistant managers and managers, the problem of the nature and scope of relief to be given arises. The evidence presented by the plaintiff established that it suffered severe monetary losses as a result of the defendant's success in pirating its employees, dealers and distributors. From all indications, the defendant's scheme calls for renewed and continuous efforts to the end that personal gain be made at the expense of the plaintiff and others. In such a setting, I feel that the only effective way to prevent future irreparable injury and to protect the plaintiff from similar actions by the defendant, its agents, servants, or anyone acting in its behalf or direction, directly or indirectly, is a permanent injunction restraining the defendant from recruiting or attempting to recruit employees, dealers and distributors of the plaintiff. The court has the power to grant such relief, cf., e.g., Silverstein v. Abco Vending Service, 37 N.J. Super. 439, 446 (App. Div. 1955), and it is so ordered.
The question of whether or not the plaintiff is entitled to an injunction restraining the defendant from employing, for a period of one year, all former employees, dealers and distributors of Wear-Ever who were recruited by the defendant during the months of November and December 1960, presents a slightly different problem. Admittedly, the defendant, Townecraft, did not abide by the "rules of the game," see Sustick v. Slatina, supra, 48 N.J. Super., at p. 144, when it unjustifiably recruited the plaintiff's employees; however, any relief aimed at undoing the wrong *149 which it committed will have a direct effect on the right of innocent, nonparty, pirated dealers and distributors to seek better business opportunities, see e.g., Abalene Exterminating Co. of N.J., Inc. v. Elges, 137 N.J. Eq. 1, 3 (Ch. 1945); and Haut v. Rossbach, 128 N.J. Eq. 77 (Ch. 1940), affirmed per curiam, 128 N.J. Eq. 478 (E. & A. 1941). This being true, it is my opinion that this court would not be functioning as a court of conscience if it, in effect, enjoined innocent individuals who were not named as parties to the suit or given their day in court.
All of the cases cited by the plaintiff in support of its claim that it is entitled to a one-year mandatory injunction have one thing in common, viz., the court granting the decree was able to return the parties to the status quo which existed before the defendant's wrongdoing. See Nystrom v. Pennycook, 29 N.J. Super. 456 (App. Div. 1954) (removal of a retaining wall); Rayhertz, etc., Corp. v. Fulton, etc., Co., 124 N.J. Eq. 121 (Ch. 1938) (removal of sign); Stanford v. Lyon, 37 N.J. Eq. 94 (Ch. 1883), modified in part, 42 N.J. Eq. 411 (E. & A. 1886) (removal of parts of a building); Ventresca v. Ventresca, 182 Pa. Super. 248, 126 A.2d 515 (Super. Ct. 1956) (removal of a garage); and Farmers Trust Co. of Lancaster v. Miller, 116 Pa. Super. 446, 176 A. 815 (Super. Ct. 1935) (removal of obstruction for the free and uninterrupted use of a railroad siding). A return to the status quo is not possible in this case since the court does not have the power or right to compel men to work for a particular party. Furthermore, a one-year injunction of the type desired by the plaintiff would result, in effect, in a retrospective writing of a one-year non-competitive restrictive covenant into the dealers' and distributors' contracts which Wear-Ever uses; i.e., under the plaintiff's contract each distributor and/or dealer was free to work for anyone else they wanted to during their relationship with Wear-Ever.
So that there be no misunderstanding in the future, I should like to point out that the main reason for denying *150 the plaintiff the one-year injunctive relief which it seeks is that the rights of innocent third parties are involved. Had the plaintiff joined certain of defendant's employees as party defendants, e.g., Eisenfeld, I would have had no hesitancy in enjoining them from working for the defendant for a reasonable length of time. In other words, a corrective injunction would have been ordered against all individuals, corporations, agents, servants or employees, who were named as parties and who acted in concert with the defendant, Townecraft, in its planned program of pirating the plaintiff's employees, dealers and distributors.
The great care which a court of equity should exercise in the granting of injunctive relief has been constantly reiterated in the reported cases of this State. See, e.g., N.J. State Bar Ass'n v. Northern N.J. Mortgage Associates, 22 N.J. 184, 194 (1956); Trisolini v. Meltsner, 23 N.J. Super. 204, 208 (App. Div. 1952); Devine v. Devine, 20 N.J. Super. 522, 528 (Ch. Div. 1952); and Light v. National Dyeing & Printing Co., 140 N.J. Eq. 506, 510 (Ch. 1947). Even where factual situations are presented which would justify the granting of injunctive relief, this power should be limited to preventing irreparable harm and correcting the effects thereof and not as a punitive measure to be imposed after the wrong is done. This is especially true when the injunction will affect vital rights of innocent people who are not named as parties to the suit.
Although I do not feel that Wear-Ever is entitled to the second form of injunctive relief which it seeks, I am of the opinion that it is entitled to an accounting and damages from Townecraft to the end that the defendant be made to respond in damages for its unpardonable self-motivated activities. The nature and scope of this accounting shall include, but shall not be limited to, the loss of profits directly and proximately attributable to the defendant's pirating. The damages flowing from the tortious conduct of defendant shall include (but not by way of limitation): (1) the monetary value of the training of *151 the pirated employees (i.e., those 35 individuals named on pages one and two of D-4 in evidence), and (2) the cost of recruiting and training new employees to replace the pirated individuals in the given areas. I will fix an early date for a supplemental pretrial covering the actual scope and nature of the accounting and damages to which I have alluded, after which the parties will have sufficient time for additional discovery.
The fact that the plaintiff did not ask, specifically, for an accounting or damages in paragraph five of the pretrial order is not a sufficient or valid reason for denying or withholding this form of relief at the present time. The plaintiff did ask in its complaint in paragraph four of its ad damnum clause "for all other and further relief to which the plaintiff may be entitled." Equity and good conscience compel the conclusion that the defendant respond in damages for its tortious conduct. A denial of such relief would, in effect, operate as a sanction of commercial immorality and would permit the defendant, as a wrongdoer, to rely upon the rights of innocent pirated employees to completely and effectively shield itself from the consequences of its wrongful actions. The wall of personal rights which the defendant hides behind to avoid the imposition of injunctive relief can afford no protection insofar as monetary damages are concerned.
I should like at this point to commend counsel for the respective parties for their cooperative attitude during the trial of this case, for their competence in the conduct of the actual trial, and for their comprehensive and extensive legal research before and after the trial. Resourcefulness of counsel is as much appreciated as is candor.
Present an appropriate form of judgment.