**In re GOLDEN DISTRIBUTORS, LTD.; Capital Cigar and Tobacco Company, Incorporated; Metropolitan Distribution Services, Inc., etc., Debtors.**

**GOLDEN DISTRIBUTORS, LTD.; Capital Cigar and Tobacco Company, Incorporated; Metropolitan Distribution Services, Inc., Plaintiffs,**

**v.**

**Harold WEBER, Middlesex Tobacco & Confectionery, Inc., William Townsend and Jacob Townsend, Defendants.**

**Bankruptcy Nos. 90 B 21146 to 21149. No. 91 Adv. 6060.**

United States Bankruptcy Court, S.D. New York.

June 28, 1991.

See also 128 B.R. 349.

Summit Rovins & Feldesman, New York City, for debtors.

Shore & Zahn, East Brunswick, N.J., for Harold Weber, William Townsend and Jacob Townsend.

Waters, McPherson, McNeill, Rosen, New York City, Waters, McPherson, McNeill, P.C., Secaucus, N.J., for Middlesex Tobacco & Confectionery, Inc.

## DECISION ON MOTION FOR PRELIMINARY INJUNCTION

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The plaintiff-debtors in the above-captioned Chapter 11 case originally sought injunctive relief against their former employees, Harold Weber ("Weber"), William and Jacob Townsend ("the Townsends") and the defendants' current employer, Middlesex Tobacco & Confectionery, Inc. ("Middlesex"). During the course of the hearings in this matter, the complaint against the Townsends was dismissed from the bench, leaving Weber and Middlesex as the remaining defendants. The debtors are in the business of distributing tobacco, candy and grocery-related products throughout the Northeastern United States, selling to chain stores, wholesalers and retailers. Defendant, Middlesex, also distributes the same line of products, namely cigarettes, tobacco and candy, which are sold mainly to retailers in New Jersey. Defendant, Weber, was formerly employed by the debtor Golden Distributors, Ltd. ("Golden") to serve as a division director of the New Jersey facility for Golden and its affiliated companies. As an employer of Golden, Weber signed a noncompetition agreement

whereby he agreed not to compete with Golden for one year after the termination of his employment and not to use confidential information obtained from Golden.

On April 4, 1991, Weber resigned his employment with Golden and joined Middlesex. Plaintiffs commenced an action to enforce Weber's restrictive agreement and to restrain the defendants from improperly using plaintiff's confidential information for their own use. Plaintiffs' pending action is for conversion of its property, tortious interference with contractual relations, breach of the duty of loyalty, tortious interference with economic advantage and breach of restrictive covenant.

In furtherance of plaintiffs' pending action they have sought preliminary injunction for the permanent relief sought in their complaint. Hearings were held with respect to the preliminary injunction, resulting in the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. The plaintiff, debtors, filed with this court on November 13, 1990 petitions for relief under Chapter 11 of the Bankruptcy Code and were continued in possession and management of their businesses and properties pursuant to 11 U.S.C. §§ 1107 and 1108. The separate cases were consolidated for administration purposes only. The debtors' principal offices are located in Hauppauge, New York.

2. On May 14, 1990, plaintiff, Golden, purchased the stock of Metropolitan Distributing Services, Inc., ("Metropolitan"), which was in the business of distributing cigars, cigarettes and candy products. Metropolitan maintained an office and distribution facility in East Hanover, New Jersey. Defendant, Weber, was employed as a sales manager for Metropolitan. The Townsends were salesman for Metropolitan.

3. On May 10, 1990, plaintiff, Golden, hired Weber in connection with its purchase of the stock of Metropolitan as a Director of Sales at an annual salary of $82,000.00 for a period of three years. The written contract with Weber expressly defined his duties and contained a clause whereby Weber agreed not to compete with the plaintiffs for one year after the termination of his employment. The relevant portion of this agreement is as follows:

> *Duties.* Executive initially shall be engaged as a Director of Sales, subject to the direction of the Company's Board of Directors (the "Board"), the Company's President, the Company's Vice President–Sales and such other officers of the Company as the President may designate. Executive shall perform and discharge well and faithfully the duties which may be assigned to him from time to time by the Company in connection with the conduct of its business or the business of any subsidiary or affiliate of the Company, including, without limitation, MDSI. Nothing herein shall preclude the Board from changing Executive's title and duties if the Board has determined in its reasonable judgment that such change is in the Company's best interests. If Executive is elected or appointed a director or officer of the Company or any subsidiary or affiliate thereof during the term of this Agreement and should Executive, at his option, accept such appointment or election, Executive will serve in such capacity without additional compensation. Executive shall initially be located at MDSI's East Hanover, New Jersey facility. The Company shall not, without Executive's consent, relocate Executive to a business location which is more than 60 miles from such facility or any other business location to which Executive shall have agreed to transfer.
>
> *Disclosure of Information.* Executive recognizes and acknowledges that the trade secrets of the Company and its affiliates and proprietary information and procedures, as they may exist from time to time, are valuable, special and unique assets of the Company's business, access to and knowledge of which are essential to the performance of Executive's duties hereunder. Executive will not, during or after the term of his employment by the Company and for a peri-

od of one (1) year after termination of his employment by the Company disclose, in whole or in part, such secrets, information or processes to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall Executive make use of any such property for his own purposes or for the benefit of any person, firm, corporation or other entity (except the Company) under any circumstances during or after the term of his employment; *provided,* that after the term of his employment these restrictions shall not apply to such secrets, information and processes which Executive demonstrates are then in the public domain (provided that Executive was not responsible, directly or indirectly, for such secrets, information or processes entering the public domain without the Company's written consent). Executive agrees to hold as the Company's property, all memoranda, books, papers, letters, and other data, and all copies thereof and extracts and summaries made therefrom, in any way relating to the business and affairs of the Company and/or any of its affiliates, whether made by him or otherwise coming into his possession, and on termination of his employment, or on demand of the Company, at any time, to deliver the same to the Company.

*Covenant Not to Compete.*

(a) Executive acknowledges and agrees that during his employment with the Company and for a period of one (1) year following the termination of such employment, he will not in any way, directly or indirectly, whether for his account or for the account of any other person, firm or company, engage in, represent, furnish consulting services to, be employed by, or have any interest in (whether as owner, principal, director, officer, partner, agent, consultant, stockholder, or otherwise) any business which (i) distributes, sells or solicits or accepts orders for tobacco, candy or groceries from the manufacturer or wholesaler or to the retailer or (ii) otherwise engages in the same line(s) of business as the Company and its affiliates. Further, Executive shall not (y) (sic) induce or attempt to induce any person or entity which is a customer of the Company or any of its affiliates as of the date of termination of Executive's employment (or was a customer thereof within one year prior to such termination) to cease doing business in whole or in part with the Company or (2) solicit or endeavor to cause any employee of the Company or its affiliates to leave the Company's employ. Such restrictions shall apply in (A) the State of New Jersey and (B) in any other specific geographic area and customer market within said geographic areas served by the Company or its affiliates and for which Executive has responsibility at the time of the termination of Executive's employment. This Section 7 shall not prevent the Executive from owning up to one percent (1%) of the outstanding stock of any publicly traded company which competes with the Company.

(b) Notwithstanding anything to the contrary contained herein, the provisions of this Section 7 shall not be effective (sic) if (i) the Company terminates Executive's employment other than in accordance with the provisions of this Agreement, including, without limitation, those of Section 2 above, or (ii) the Company fails to extend to Executive at the expiration of the term of this Agreement an offer to continue employment with the Company for an additional three (3) year period on terms comparable to those contained in this Agreement.

(c) Executive agrees that this covenant is reasonable with respect to its duration, geographic area and scope. It is the desire and intent of the parties that the provisions of this Section 7 shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular portion of this Section 7 shall be adjudicated to be invalid or unenforceable, this Section 7 shall be deemed amended to reduce in scope and/or duration the portion thus adjudicated to be invalid or unenforceable to the extent necessary to render it valid and enforceable, such

amendment to apply only with respect to the operation of this Section 7 in the particular jurisdiction(s) in which such adjudication is made. The existence of any claim or cause of action by Executive, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of the restrictive covenants provided for herein and shall be litigated separately.

(d) Nothing in this Section shall reduce or abrogate Executive's obligations during the term of this Agreement under Sections 4 and 5 hereof.

4. Weber had worked in the wholesale candy and tobacco business for twenty-one years, having started with Metropolitan as an employee in its warehouse, and worked his way up to sales manager. His job was to develop sales programs, sales techniques and to call on certain key accounts, such as chain stores and high volume accounts.

5. At about the time that Golden purchased the stock of Metropolitan, Sander Katz, the vice president of defendant Middlesex, telephoned Weber and asked if he was available to work for Middlesex. Weber responded that he was going to stay with the new business and accept Golden's offer as a sales manager.

6. In November of 1990, after Katz learned that Golden had filed for Chapter 11 relief, he again telephoned Weber to inquire as to Weber's status. Weber said that everything was fine and that he was still employed by Golden. Katz responded by wishing Weber good luck and the conversation terminated.

7. In March of 1991, Weber telephoned Katz to say that he was dissatisfied with his situation at Golden; that Golden had not honored his employment contract and that in view of the current situation, Weber wanted to know if Katz might still be interested in his services. They arranged to meet to discuss the situation.

8. Shortly thereafter, in March of 1991, Weber met with Katz. Weber was dissatisfied with events transpiring at Golden. After Golden filed its Chapter 11 case, it discontinued its contributions to the employees' pension benefit plan; it discontinued paying for telephones in the automobiles of certain employees, including Weber's, which telephone Weber used to conduct business while commuting to Golden's East Hanover facility. Golden also reduced certain other fringe benefits. Additionally, Weber thought that his total compensation from Golden would amount to $100,000.00, rather than the $82,000.00 he actually received. When he asked for an increase in September of 1990, he was given a $10,000.00 increase by Golden to $92,000.00, rather than the $100,000.00 he requested.

9. At the meeting between Weber and Katz in March of 1991, Katz discussed some of the problems at Middlesex. Katz told Weber that he wore too many hats and that he needed help in sales because many of the Middlesex salesmen were near retirement age. Middlesex needed a director of sales to train new salesman, and to make the current salesmen more than just order takers. Katz referred Weber to Stephen Abbott, the attorney for Middlesex, to review Weber's contract with Golden and to prepare a new contract with Middlesex.

10. On April 1, 1991, without prior warning, Weber was informed by David Hofmann ("Hofmann"), Golden's vice president of operations, that Golden was closing down the East Hanover, New Jersey facility. Hofmann told Weber that his employment was not in jeopardy and that it was doubtful that Weber's pay would be reduced. Weber was informed that the deliveries to Golden's customers in New Jersey would thereafter be made from Golden's other facilities in Port Chester, New York and Baltimore, Maryland. Hofmann also informed Weber that Weber would be offered a new job as a Director of Sales for the Northeast Region, covering New England, Connecticut, New York, Pennsylvania and New Jersey. Weber was not pleased with this offer because his contract with Golden specifically provided that Weber could not, without his consent, "be required to relocate ... to a business location which is more than 60 miles from such facility [in East Hanover, New Jersey] ...".

11. By letter to Hofmann dated April 4, 1991, Weber tendered his resignation to Golden, effective as of April 4, 1991. In this letter Weber cited the following reasons for resigning:

1. My 401k program has been eliminated.
2. My dental insurance program has been eliminated.
3. My medical insurance program has been severely cut back.

In addition to the foregoing, it is clear to me from the company's recent actions that the company's New Jersey operations will no longer be stable. The East Hanover New Jersey facility will be closed on June 1, 1991. My title as "Division Director of New Jersey" has been eliminated and my duties have completely changed. Quite frankly, it appears that the company will not be in a position to meet with its contractual obligation to myself, nor do I foresee long term health for the corporation, as (sic) least as to its New Jersey activities.

Sincerely,
/s/ Harold Weber
Harold Weber

12. When Weber resigned, he then had at his home certain Golden records. Weber testified that he took the records home because his office was kept open to allow various survey people who were studying Golden's operations to have access to all its facilities. Weber said that he brought the records home for safekeeping. In response to his letter of resignation, Hofmann wrote to Weber on April 5, 1991 requesting Weber to return all documents belonging to Golden. On April 11, 1991, seven days after his resignation, Weber returned the following documents to Golden:

1—Company–Services Overview
4—Company Services/System Reports Overview
1—Corporate Mask File (Lists Computer Pricing Matrices)
1—K Mart business Overview
1—Golden–Capital Distributors Corporate Accounts Mid–Atlantic Division
1—Golden–Capital Distributors Operating Business Plan 1991

13. Weber testified, and there was no proof to the contrary, that he has no other records of Golden in his possession; that he did not attempt to memorize any of the documents which he returned; that a portion of Golden's Operating Business Plan was prepared by him; that he did not divulge any of the information in the documents to Middlesex and that neither he nor Middlesex is using any of the information in the course of Middlesex' business activities.

14. An examination of the documents which Weber had in his possession and returned to Golden reveals that they do not contain the name, address, customer profile, credit information, or contact person for a single Golden retail customer in New Jersey.

15. One of the two loose leaf binders entitled "Golden Capital Distributors Operating Business Plan 1991" contains marketing analysis for Golden's facilities. It contains an organization chart and has separate merchandising, marketing and operational functions. A proposed budget based on pre-Chapter 11 assumptions was also included. Significantly a document entitled "The Bottom Line", which was included as an exhibit in the Operating Business Plan, intended for distribution to Golden's customers, is clearly not a confidential document. It reflects stated prices and discount prices to the trade. The prices change from month to month. The editor is Golden's Vice President, E. McQuigg. This information is not intended to be confidential and is distributed to customers who are free to show the documents to other suppliers for the purpose of getting lower price quotations.

16. A second loose leaf binder which Weber returned is entitled "Golden Capital Distributors Corporate Accounts Mid–Atlantic Division". It relates to the chain stores and large accounts serviced by Golden. Defendant, Middlesex, does not sell to this trade. In any event, this book does not refer to a single retail customer in New Jersey. The information as to these accounts relates to the servicing directions furnished by the accounts to their suppliers

and is the type of information that these accounts would furnish to all their suppliers, not just Golden.

16. Also included in the documents returned by Weber were seven soft cover manuals. Two of the manuals were captioned "Ordering Process". They contained velocity reports and merchandising reports as to Golden's product lines. No customers are named in these reports. A third manual is entitled "Merchandising Support Services and Systems" and relates to Golden's product lines and operational programs. No customers are named. A forth manual deals with Golden's product lines. Similarly, no customers are listed. A fifth manual deals with product selection and other internal operational programming. No customer information is listed in this manual. The sixth manual is entitled "K Mart Business Review". This manual lists the procedures to be followed in servicing K Mart, which K Mart gives to its suppliers, including Golden. K Mart is a large chain which defendant Middlesex does not solicit for sales because Middlesex only deals with New Jersey independent retail customers. If Middlesex wished to service K Mart in the future, Middlesex could get the same type of information from K Mart. The seventh manual entitled "Corporate Mask File" lists information about Golden's chain store and large customers in Delaware, Maryland, Virginia, West Virginia, Pennsylvania, North Carolina and the District of Columbia. No New Jersey customers were listed in this manual.

17. There was no evidence that Weber solicited for Middlesex any of Golden's New Jersey retail customers. Moreover, there was no proof that he was likely to do so in the future. If Weber was familiar with the names and customer profiles of Golden's customers in New Jersey, such familiarity was not obtained from the two loose leaf books and seven manuals which he returned to Golden on April 14, 1991. Additionally, there was no proof that Weber conveyed any confidential information belonging to Golden to Middlesex or its salesmen, or that he threatened to do so in the future.

18. There was proof that the Townsends solicited Golden's customers in northern New Jersey after they submitted their letters of resignation, each dated April 11, 1991. However, there was no proof that the Townsends had in their possession any customer list belonging to Golden or that they used any confidential information or infringed any trade secrets belonging to Golden when they solicited these New Jersey accounts. The Townsends had been salesmen for Golden's predecessor, Metropolitan, for many years and were personally known to the accounts they serviced, which they continued to service after Golden acquired Metropolitan. The Townsends were not parties to any restrictive agreement with either Metropolitan or Golden and were free to solicit their former customers after they resigned from Golden. Accordingly, the complaints filed by the plaintiffs naming the Townsends as defendants were dismissed after the close of the plaintiffs' case for insufficient evidence to support a *prima facie* case.

19. Golden's records reflect that they had annual gross sales from New Jersey of approximately $110 million. The chain stores and large accounts produced about 15% of Golden's total sales throughout the United States. The Townsends accounted for about $11 million in gross sales from New Jersey. Golden estimates that it will lose over $7 million annually in the Townsends' territory in New Jersey as a result of their sales activities for Middlesex. Thus, Golden does not claim that the lost sales in New Jersey are attributable to any conduct on the part of defendant Weber. These lost sales to independent retailers in New Jersey were attributable to the sales activities of the Townsends, who are no longer defendants in this case because the plaintiffs have failed to establish a *prima facie* case against the Townsends.

20. Another aspect of the plaintiffs' claim against defendant, Weber, relates to his sale of some trading cards to a customer just before he joined defendant Middlesex, which sale resulted in depleting Golden's inventory of these trading cards by approximately 90%. On March 13 and

April 1, 1991, Weber sold to one of Golden's largest customers, Vikisha, 1,240 boxes of Skybox Trading baseball cards at cost. These cards are apparently difficult to obtain. Whether or not Weber was authorized to make this sale to Vikisha may be the subject of an action by Golden against Weber for damages, but is not a reason for awarding injunctive relief against him for this conduct, as requested by the plaintiffs.

21. Plaintiffs also charge that on April 1, 1991, just before Weber resigned to join defendant Middlesex, he opened a new account for Middlesex, a competitor of the plaintiffs, and sold De Nobili cigars to Middlesex at a time when these cigars were difficult to obtain. The cigars were invoiced to Middlesex in the sum of $2,700.10 and $2,177.85, which amounts included a profit to the plaintiffs. Katz, the vice president of Middlesex, testified that when he received the invoice from Golden reflecting a retail price and sales tax, he telephoned Weber to look into the matter. Weber testified that Middlesex had been a customer of Golden's predecessor, Metropolitan, and that traditionally, if another distributor needed some help or fill-ins, it was customary for a distributor to help another distributor. Thereafter, Weber arranged to have the De Nobili cigars sold to Middlesex at cost and without the sales tax. As in the case of the baseball cards sold to Vikisha, if this conduct constituted a breach of Weber's fiduciary duty to plaintiffs, a claim for damages would be appropriate. However, this transaction does not sustain the injunctive relief requested against the defendants.

22. After Golden announced on April 1, 1991 that it was closing down its East Hanover, New Jersey facility, the Townsends, who were then salesman for Golden, arranged an interview with Katz of Middlesex on April 5, 1991 for the purpose of joining Middlesex as salesmen. Katz testified that although Weber had not yet joined Middlesex as an employee, he, nonetheless, asked Weber to sit in on the meeting because Katz did not know the Townsends and felt that the interview would be easier if they saw a familiar face, namely, Weber. Katz asked Weber to introduce them, which Weber did. As a result of this meeting, Katz agreed to employ the Townsends as salesmen for Middlesex. As previously noted, if this participation by Weber constituted a breach of contract or a breach of his fiduciary duty to plaintiffs, they may be adequately compensated by damages, if successful. However, Weber's conduct with respect to the Townsends joining Middlesex does not warrant injunctive relief against the defendants, as requested by the plaintiffs.

23. There was also evidence that Raymond Pascarella, a delivery driver for Golden, applied to Middlesex for employment pursuant to a written employment application dated April 11, 1991. This was after the debtors filed for Chapter 11 relief and after Golden announced that it was going to close its East Hanover, New Jersey facility. Pascarella was not hired by Middlesex. There was no evidence that either of the defendants had anything to do with Pascarella's application for employment or that they solicited his services.

24. The evidence reveals that at least 15% of plaintiffs' sales are to chain stores. Golden's vice president in charge of sales, Peter Gregorio, testified that no chain store customers were lost to Middlesex. This is because Middlesex does not solicit this business. Katz of Middlesex testified that approximately 88% of the Middlesex business arises out of the sale of cigarettes and that there is no competition in the price of cigarettes because the price is fixed by law in New Jersey. Therefore, only 12% of his remaining sales involve products where there is price competition and no fixed prices.

25. There was no proof that Middlesex made use of any of plaintiffs' trade secrets, confidential information or customer lists in soliciting plaintiffs' customers in New Jersey. The names and addresses of vendors of tobacco products and candy are easily obtainable from telephone books, and other public sources and trade information. The area of competition between the parties is limited to independent retailers of tobacco and candy products in New Jersey

and excludes the chain stores and large wholesalers which Middlesex does not solicit. Certainly, Middlesex, located in New Jersey, is able to ascertain the names of retail vendors of tobacco and candy products in New Jersey. The main competition comes from the fact that the Townsends are now soliciting their former customers on behalf of Middlesex. This competition is not as a result of purloined customer lists or through the use of trade secrets. Cigarette prices are not secret because they are fixed by state law. The prices for other tobacco products and candy are not secret. Retail customers let the competing salesmen know what they pay and ask that the prices be matched. Golden distributes its price list and discounts in its "The Bottom Line" bulletin, which is not confidential.

26. Although defendant Weber had access to information prepared by Golden as to customer profiles which is contained in Golden's computer printouts, there was no proof that he retained any printouts as to Golden's customer profiles. There was no evidence that Weber's duties for Middlesex included the solicitation of retail customers in New Jersey. Moreover, there was no evidence that in his capacity as Director of Sales for Middlesex, Weber conveyed to any of the salesmen for Middlesex any trade secrets or confidential information belonging to the plaintiffs. Significantly, there was no proof that the plaintiffs lost any customers to Middlesex because of any trade secrets, confidential information, or customer lists which Weber might have had access to while employed by Golden.

27. Although Katz of Middlesex originally contacted Weber after Golden acquired Metropolitan, and again after the plaintiffs filed their Chapter 11 petitions, there was no evidence that Katz had any further contacts with Weber until March of 1991, when Weber became disenchanted with his position with Golden. Katz and Middlesex did not induce Weber to join Middlesex. Weber took the initiative in March of 1991 and his decision became solidified when the plaintiffs' planned to close their East Hanover, New Jersey facility and eliminate Weber's job. The new job which was offered to him did not meet his satisfaction because he believed he would have to do more travelling then he wanted and would have to cover a larger area. Thus, it was not Middlesex which induced Weber to resign.

## DISCUSSION

### *Preliminary Injunction*

In order to obtain a preliminary injunction, a party must show (1) irreparable harm and (2) either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). The term "irreparable harm" means injury for which a monetary award cannot be adequate compensation, so that if monetary damage is adequate compensation a preliminary injunction will not issue. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d at 79; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d at 72. Manifestly money would be adequate compensation if defendant Weber depleted plaintiff Golden's inventory of valuable baseball trading cards when he sold them to Golden's customer, Vikisha, allegedly without authority and allegedly in violation of his fiduciary duty as an employee of Golden. Similarly, monetary damages would be adequate compensation if Weber's sale of De Nobili cigars to Middlesex at cost just before he joined Middlesex constituted a breach of his fiduciary duty to Golden. Accordingly, Weber's conduct with respect to the sale of baseball trading cards and De Nobili cigars will not justify the issuance of a preliminary injunction.

### *Weber's Restrictive Covenant*

Whether or not defendant Weber breached his restrictive covenant with Golden when he resigned and joined defendant Middlesex, and whether or not his defense that Middlesex previously breached

his employment contract by reducing his fringe benefits and changing his duties after eliminating his current job in New Jersey are not issues which need be decided at this time. Assuming that the restrictive covenant which Weber signed is reasonable in time and scope and was enforceable when Weber joined Middlesex on April 8, 1991, so that Middlesex could sue Weber for breach of contract damages, it nonetheless must be determined whether plaintiffs may obtain a preliminary injunction restraining Weber from working for Middlesex.

*Likelihood of Success*

The contract between Golden and Weber expressly states that it shall be governed by New York Law. Generally, a restrictive covenant which prevents an employee upon termination of the employment from earning a livelihood in the area of previous employment will be enforced only if the restriction is reasonable in scope and duration and necessary to protect against the disclosure of trade secrets or other confidential information, or solicitation of customers, or when the employee's services are unique or extraordinary. *Business Intelligence Services, Inc. v. Hudson,* 580 F.Supp. 1068, 1071 (S.D.N.Y.1984); *Reed Roberts Assoc. Inc. v. Straumann,* 40 N.Y.2d 303, 308, 386 N.Y.S.2d 677, 680, 353 N.E.2d 590, 593 (1976). The restrictive covenant will be enforced "only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists, ...". *Columbia Ribbon & Carbon Mfg. v. A-1-A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977). The plaintiffs did not show that Weber had any customer lists or that there were any trade secrets or confidential information with respect to Golden's sale of tobacco and candy products to independent retail stores in New Jersey. As a division manager of Golden's New Jersey facility, Weber concentrated on programs, marketing techniques and sales to chain stores and wholesalers. There was no proof that he ever solicited retail stores in New Jersey or that he knew the names and customer profiles of Golden's New Jersey independent retail customers. Moreover, in his new job with Middlesex, Weber does not solicit sales from customers nor was there any evidence that he possessed secret or confidential information which he might impart to the salesmen he supervises. There was no proof that Golden lost any customers, or might lose any customers, due to Weber's employment by Middlesex. Plaintiffs produced evidence that they lost independent retail customers in New Jersey as a result of the activities of the Townsends, who were former salesmen for Golden and who were not subject to any restrictive agreement.

Plaintiffs rely heavily upon the holding in *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207 (S.D.N.Y. 1987) where a preliminary injunction was granted to enforce a restrictive agreement wherein the defendant, former employee, agreed that the employer plaintiff's customer lists were property of the employer. In the *Churchill* case the former employee misappropriated specific customer lists which disclosed the names, addresses, accounts receivable information and names of contact persons. The former employee held on to these customer lists for many months after he left the plaintiff's employ and formed a company in competition with the former employer. The defendant actually used the customer lists to solicit business from the listed companies with the result that he took business away from the former employer. The Churchill case is not applicable to the instant situation because Weber did not take any customer lists when he left Golden's employ. He did have in his possession some manuals dealing with Golden's business plan. There was no proof that any of Golden's New Jersey customers were named or identified in these manuals. Moreover, there was no proof that Weber had any specific information as to any of Golden's New Jersey retail customers or that he thereafter solicited any such customers or threatened to do so in the future. Weber may have had contacts with Golden's large wholesale and

chain store customers generally, but there was no proof that he ever dealt with any of Golden's New Jersey retail customers while employed by Golden.

The fact that Weber was Golden's Division Sales Director for New Jersey does not of itself mean that his services were unique or extraordinary. No specific training or formal education was required to perform this position other than on the job experience. Weber rose to this position after having commenced his employment with Metropolitan as a warehouse employee. In *Scott Paper Co. v. Finnegan,* 101 A.D.2d 787, 476 N.Y.S.2d 316 (App.Div. 1st Dept.1984), it was held that a regional sales manager, managing 60% of the plaintiff's total business, did not render services that were unique or extraordinary. The court also noted that customers and prices in the paper products industry were readily available to the manufacturers and were not trade secrets.

> Moreover, such data as customer preferences, pricing information and other competitive information (promotions, services, etc.) in the paper industry are readily available and freely communicated to various manufacturers through the distributors who handle the products of several manufacturers and seek to gain competitive advantage in their self-interest. Moreover, any knowledge of allowable price deviations and permissible price margins used by Scott to meet the competition that was acquired by Finnegan during his employment at Scott appears now to be outdated information. Price decisions are made on current competitive information which fluctuates constantly and rapidly in the industry.

*Scott Paper Co. v. Finnegan,* 476 N.Y.S.2d at 318. Similarly, in *Molina v. Barany,* 56 N.Y.S.2d 124 (Sup.Ct.N.Y.Co.1945), it was ruled that a sales manager's services were not unique, but because he had cultivated and obtained plaintiff's customers he was restrained from soliciting these customers for a competitor. In order to show that the services are extraordinary or unique, proof must be adduced to establish that the employee more than excels at his or her work or that the employee's performance is of high value to the employer. "It must also appear that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury." *Purchasing Assocs., Inc. v. Weitz,* 13 N.Y.2d 267, 274, 246 N.Y.S.2d 600, 605, 196 N.E.2d 245 (1963). In the instant case there was no proof that Weber's services were so unique that he could not be replaced. Indeed, the irreparable injury claimed by the plaintiffs is not the loss of Weber's services, but that he had access to customer names and profiles. There was no proof that he purloined any New Jersey customer information or that it was likely that he would solicit any such customers or direct the Middlesex salesmen to solicit such customers. Such information was unnecessary because the Townsends knew the names and addresses of Golden's New Jersey customers.

Consideration should also be given to New Jersey law because the activities of the parties were centered in New Jersey. Therefore, it is appropriate to determine whether enforcement of Weber's restrictive obligation would violate New Jersey's public policy. *See Solari Industries, Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970). (Restriction under one year noncompetition clause enforced only as to dealings with any of plaintiff's actual or prospective customers). Post-employment restrictive agreements are enforceable in New Jersey, but in recognition of the difference in bargaining power of the parties, such contracts are enforceable only if they protect the legitimate interests of the employer, impose no undue hardship on the employee, and are not injurious to the public. *Ingersoll–Rand Co. v. Ciavatta,* 216 N.J.Super. 667, 524 A.2d 866 (1987), *aff'd,* 110 N.J. 609, 542 A.2d 879 (1988); *Whitmyer Bros., Inc. v. Doyle,* 58 N.J. 25, 274 A.2d 577 (1971). (The doubtful nature of the employer's claimed trade secrets or confidential information pointed to the inappropriateness of any preliminary relief granted on the suggested legitimate interests of the employer in its trade secrets or confidential information). In the instant case, there

was no proof that Weber used plaintiffs' trade secrets or any customer lists belonging to the plaintiff in connection with his services for Middlesex, nor does it appear that such services are unique or extraordinary.

Accordingly, it does not appear likely that the plaintiffs will be able to succeed under Count I of the complaint, which seeks to enjoin the defendants from competing with the plaintiffs because of the restrictive covenant in Weber's contract with Golden. Nor does it appear that there are serious questions going to the merits of plaintiffs' claim to enjoin Weber from working for Middlesex, which would justify the issuance of a preliminary injunction.

Count II of the complaint alleges that Middlesex tortiously interfered with Golden's restrictive agreement with Weber. This Count does not invoke the validity of the contract between Golden and Weber, and therefore, New York law will not apply. The totality of the facts involving this charge relate to activities in New Jersey where the Golden East Hanover facility and the Middlesex operations are located. Therefore, New Jersey law will apply as to the allegations in the complaint charging the defendants with improper conduct in New Jersey.

The evidence reveals that Weber approached Middlesex in March of 1991. Middlesex did not then solicit Weber's services after Weber informed Middlesex the year before that he was content to remain with Golden after it purchased Metropolitan and, later, after the plaintiffs filed for Chapter 11 relief. Weber joined Middlesex because his fringe benefits were impaired, the New Jersey facility was going to be closed and because the new job offered to him by Golden involved more travel time than he was prepared to undertake. Although Middlesex was aware of Weber's employment contract with Golden and its restrictive agreement clause, it accepted Weber's explanation that the contract had been breached by Golden for the various reasons given by Weber. "A *sine qua non* of interference with contractual relations of prospective economic advantage is that the interference be unreasonable." *Glasofer Motors v. Osterlund, Inc.*, 180 N.J.Super. 6, 433 A.2d 780 (1981). Middlesex did not act unreasonably when Weber applied to Middlesex for employment and said that the reduction in his contractual benefits following Golden's filing for Chapter 11 relief amounted to a breach of contract and that Weber was no longer contractually bound to Golden. There was no proof that Middlesex intentionally or maliciously interfered with Golden's contractual relationship with Weber. Accordingly, the plaintiffs have not sustained their burden of showing that they will likely succeed as to this Count or that the merits of their claim will justify the issuance of a preliminary injunction.

Count III alleges that plaintiffs lost customers due to the Townsends' actions in converting confidential information, pursuing their former customers while working for Middlesex in violation of plaintiffs' interests in confidential and proprietary information. The complaints against the Townsends were dismissed from the bench because there was no evidence that the Townsends violated any of plaintiffs' rights. In view of the fact that there was no evidence that the Townsends had any contracts with the plaintiffs, it follows that Middlesex was free to hire them as salesmen. There was no evidence that the Townsends used any confidential information or purloined any trade secrets belonging to the plaintiffs or that the Townsends engaged in any unfair competition other than to solicit their former customers. There was no proof that the Townsends solicited any Golden customers for Middlesex while they were still employed by Golden. Hence, after terminating their employment with Golden they could thereafter solicit their former customers.

> [T]he established rule of law ... allows a former employee, not bound by a restrictive covenant and not guilty of any breach of trust, after the termination of his employment [may] compete honestly with his former employer, even to the extent of soliciting the customers of his former employer with whom he became

acquainted in the course of his employment.

*United Board & Carton Corp. v. Britting,* 63 N.J.Super. 517, 164 A.2d 824 (1959), *aff'd,* 61 N.J.Super. 340, 160 A.2d 660 (1960). Hence, plaintiffs have not established a likelihood of success as to Count III or any justification for the issuance of a preliminary injunction as to this Count.

Count IV of the complaint alleges that the defendants "willfully, maliciously, and by dishonorable methods interfered with plaintiffs' economic advantage." Plaintiffs cite *Wear-Ever Aluminum v. Townecraft Industries,* 75 N.J.Super. 135, 182 A.2d 387 (1962) in support of their claim for malicious interference with their economic advantage. In the *Wear-Ever* case, the defendant, a competitor of the plaintiff's sales force and 43 more sales representatives terminated their employment. The defendant and a former employee of the plaintiff, conducted a campaign of telephone calls, social visits, dinners and mailing of information about the defendant to the plaintiff's employees. In the instant case, Weber and the Townsends approached Middlesex for employment when Golden closed its New Jersey facility after having filed its Chapter 11 case. There was no proof that Middlesex maliciously chose to interfere with plaintiffs' economic advantage in order to promote its interests and to harm the plaintiffs. Moreover, the Townsends approached Middlesex. Katz did not recruit or solicit the Townsends' services. The Townsends had no customer lists other than information based on their own experience and were not parties to any restrictive agreements with Golden.

Other than the loss of customers to Middlesex as a result of the Townsends' sales efforts, plaintiffs have failed to establish that any trade secrets are in jeopardy. "A trade secret may consist of a formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over his competitors who do not know or use it." *Sun Dial Corporation v. Rideout,* 16 N.J. 252, 108 A.2d 442 (1954). The only trade secret plaintiffs point to relate to customer names and customer profiles. However, no customer list involving New Jersey customers was produced, nor was it shown that the Townsends used any customer lists purloined from Golden. Additionally, plaintiffs did not name one New Jersey customer who was solicited by Weber or that he threatened to solicit in the future.

Plaintiffs failed to produce any credible evidence that there was a likelihood of success as to Count IV sufficient to warrant the issuance of a preliminary injunction.

Count V alleges that Weber breached his duty of loyalty to the plaintiffs. If plaintiffs are able to prove facts sufficient to sustain the allegations under Count V, they will be entitled to recover damages, which would be adequate compensation so that a preliminary injunction should not issue. *See JSG Trading Corp. v. Tray-Wrap, Inc.* 917 F.2d at 79; *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.* 596 F.2d at 72.

Count VI alleges that the plaintiffs have, and will continue to, suffer substantial monetary damages. This Count patently does not support the issuance of a preliminary injunction.

*Balance of Hardships*

In light of the fact that Weber has not misappropriated any trade secrets or confidential information belonging to the plaintiffs and neither possesses nor has he made use of any customer list belonging to the plaintiffs itemizing confidential information regarding customers in New Jersey, it follows that the hardship of enjoining him from working for Middlesex outweighs the legitimate interests of the plaintiffs that would be served by enjoining such employment. There is no showing that Weber attempted to pirate Golden's business by dishonorable means or that he attempted to recruit any Golden employees to work for Middlesex. Manifestly, the general skills and experience gained by Weber during his employment by Golden are not proprietary rights of Golden which may be restricted. *Ingersoll-Rand Company v. Ciavatta,* 216 N.J.Super. 667, 524 A.2d 866 (1987), *aff'd,* 110 N.J. 609, 542 A.2d 879 (1988).

As to Middlesex, there was no credible evidence that it engaged in any campaign to induce Golden's employees to leave their employment and work for Middlesex. It was only natural that employees of Golden in New Jersey would look to another New Jersey company engaged in the same business on learning that Golden planned to close its New Jersey facility and transfer the operations to Baltimore, Maryland and Port Chester, New York, in order to economize operations while under the aegis of Chapter 11 of the Bankruptcy Code. There was no clear showing of affirmative conduct on the part of Middlesex to pirate Golden's business. Instead it appears that Middlesex accepted the benefits offered to it when experienced employees of Golden applied to Middlesex for employment, without any evidence of inducements offered by Middlesex. That Weber gave Middlesex a copy of his employment contract with Golden, including the restrictive covenant, does not amount to an intentional or tortious interference with Golden's contractual rights of economic advantage. Moreover, intentional or tortious interference with a prospective economic relationship requires proof that such interference caused the loss of prospective gain. *Glass, Molders, Pottery, Plastics and Allied Workers International Union, AFL-CIO v. Wickes Companies, Inc.*, 243 N.J.Super. 44, 578 A.2d 402 (1990). Plaintiffs did not prove that Golden lost any customers or business because Weber joined them. Any loss of customers sustained by Golden in New Jersey appears to have been partly as a result of the Townsends' activities and partly as a result of the fact that Golden's deliveries to customers in New Jersey would no longer be made from New Jersey, but from other facilities in Baltimore, Maryland and Port Chester, New York. Thus, Golden's customers might have believed that their deliveries would not be made as fast as when Golden shipped its merchandise from East Hanover, New Jersey.

In these circumstances, the balance of hardships resulting from enjoining Weber from working for Middlesex in New Jersey does not tip decidedly toward the plaintiffs.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A) and (E).

2. The plaintiffs have failed to sustain their burden of proving (a) irreparable harm and (b) either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the plaintiffs.

3. The plaintiffs' motion for a preliminary injunction shall be denied and the previous stays issued by the court in this case shall be dissolved.

SETTLE ORDER on notice.